## THE IOWA.

### MONROE v. THE IOWA.

#### (District Court, D. Massachusetts. May 26, 1892.)

1. CARRIERS BY SEA—STIPULATION EXEMPTING FROM NEGLIGENCE.
    It is the settled law of the federal courts that an express stipulation exempting a common carrier, whether foreign or domestic, from liability for losses caused by the negligence of himself or his servants, is contrary to public policy, and cannot be enforced against the shipper.

2. SAME—CONTRACT OF CARRIAGE—DISPUTES TO BE SETTLED ACCORDING TO BRITISH LAW.
    A clause in the contract providing that all questions arising under the contract shall be settled according to British law is a nullity, as an attempt to impress upon the contract a construction which our law rejects as contrary to public policy.

3. SAME—TRANSPORTATION OF CATTLE—NEGLIGENT FITTING.
    Cattle were shipped on a British steamship under a contract which provided that the ship was to furnish the fittings for the cattle, but the shipper was to assume all risks of the fittings, the ship not to be responsible for any injury to the cattle arising from any cause, and all controversies to be decided according to British law. By the negligence of the employes of the ship, part of the fittings were not sufficiently secured, which fact was unknown to the shipper, and in an ordinary gale they gave way, and some of the cattle were killed. *Held*, that the ship was liable.

In Admiralty. Libel for damage to cattle. Decree for libelant.

*Proctor & Tappan* and *Payson E. Tucker*, for libelant.

*J. D. Ball*, for claimant.

NELSON, District Judge. This is a libel in admiralty filed by Albert N. Monroe, an exporter of cattle, against the British steamship Iowa, of the Warren line of transatlantic steamers, to recover for damage to cattle on a voyage from Boston to Liverpool. The cattle were shipped under a special contract in writing between the steamship company and one Hathaway, made in Boston, and assigned in part by Hathaway to Monroe, the provisions of which were expressly assented to by Monroe by a memorandum indorsed on the instrument signed by his agent. The material clauses in the contract relative to the questions now before the court are the following:

"Ship to furnish fittings." "The fittings to be such as are used on board the steamships of our line, and you [the shipper] are to assume all risks connected with said fittings. It is understood that you approve the fittings and ventilation of the steamship herein referred to, and that you will not require any change in or addition to said fittings and ventilation. Neither the steamship, her agents nor her owners, are to be accountable for the dangers of the seas, or accidents to fittings, water tanks, machinery, or condensing apparatus; nor for any other accidents; nor for any action which the authorities in Europe or America may take concerning the animals, no matter what may be the cause or consequence of such action; nor for any mortality of or injury to the animals for any cause; nor for delay in sailing caused by long passage, necessary repairs, or any circumstances beyond our control." "All questions arising on this contract shall be decided according to British law."

The contract also prescribed a form of bill of lading to be issued for the cattle, containing similar exemptions from liability on account of the fittings. The steamship sailed from Boston on the afternoon of Tues-

day, April 12, 1887, having on board in all 347 head of cattle, 232 of which were the property of the libelant, and 115 belonged to Hathaway. Of the libelant's cattle, 164 were stowed on the forward main deck. The rest of his cattle, and all of Hathaway's, were stowed on the spar deck. The cattle on the main deck were confined in pens on each side of a passageway running fore and aft, each pen holding four animals, with cleats nailed to the deck to prevent their slipping.

On Wednesday morning the ship encountered a gale from N. E., with a beam sea on the port side, which caused the ship to lurch heavily to starboard. A part of the cargo was grain in bulk, and during the gale this appears to have shifted to starboard, causing a considerable list on that side, and increasing the lurching. The consequence was that some of the pens on the starboard side of the main deck gave way, the stanchions and head boards came apart, the cleats on the deck were torn off by the struggles of the animals, and the cattle in these pens were thrown together in heaps. Twenty-two of them were killed outright, before they could be extricated; others were so badly injured that they had to be slaughtered on the spot; others suffered from being bruised and maimed. During this time the ship was steering E. S. E. and S. E. by E. ¾ E. At 10:30 p. m. on Wednesday, being then well past George's bank, her course was altered to S. E. by S., bringing the sea astern, and from that time the roll of the ship to starboard ceased, and no more trouble was experienced, although the gale continued until the next day.

The defense is that the loss was caused by the perils of the sea, without any negligence on the part of the master or officers, and that the owners are exempted from liability by the terms of the special contract.

There can be no doubt, upon the evidence, that the proximate cause of the loss in this case was not the perils of the sea, but was the insufficiency of the cattle fittings. The storm was of no unusual violence, but was such as is likely to be met with in any transatlantic voyage. It was entered on the ship's log as a "moderate gale." In regard to the fittings this appeared: The ship had carried no cattle on the main deck for seven months prior to this voyage. In the mean time the fittings had been taken down and laid away. They were put up again at Boston just before the ship sailed. Most of the pens seem to have been put together in a proper manner, and held together; but the pens that broke away, the evidence shows, were not sufficiently secured, and that this was the fault of the carpenters in doing the work. The defective condition of the pens was not known to the libelant or his agents when the ship sailed. It was the duty of the officers of the ship to see that this work was well done, and everything made secure and safe for the protection of the cattle. Their failure to do this was negligence for which the ship and owners are responsible, unless they are protected by the exemption clauses in the contract. Since the decision of the supreme court in *Liverpool & G. W. Steam Co. v. Phenix Ins. Co.*, 129 U. S. 397, 9 Sup. Ct. Rep. 469, the law of this country upon this subject, as administered in the federal courts, is settled. It was there decided that a contract made in this country for the carriage of goods in

a foreign ship to a foreign port, under circumstances similar to those in this case, is to be construed in the courts of the United States by the law of this country; and by that law an express stipulation by a common carrier for hire, whether foreign or domestic, that he shall be exempt from liability for losses caused by the negligence of himself or his servants, is unreasonable, and contrary to public policy, and cannot be enforced against the shipper. So far, then, as the exemption clauses in the contract in this case were intended to exempt the ship and owners from liability for the negligence of her officers, they must be held void, and the ship liable for the losses incurred.

The libelant is entitled to recover in spite of the clause providing that all questions arising under the contract shall be decided according to British law. This seems to be an attempt, in an indirect way, to stipulate that the shipowner shall be exempt from responsibility for the negligence of his servants, since the British law is supposed to uphold such exemptions. The form of the stipulation is immaterial, and as its purpose is plainly to impose, upon a contract made here, a construction which our law rejects as contrary to public policy, it must be held to be as much a nullity as the other clauses, which in express terms limit the liability of the owner. *The Brantford City,* 29 Fed. Rep. 373, 396.

One contention of the libelant was that the master of the ship was negligent in not earlier heading the ship to the southward, to avoid the cross seas. In justice to Capt. Walters, it is proper to say that it appears that this could not have been done sooner, without passing over George's bank, which is out of the course of steamships of the class of the Iowa, and where such vessels never go, unless driven out of their course by stress of weather. These shoals are known to be dangerous on many accounts, and he was entirely justified in refusing to change the course of the ship until well past them. Decree for the libelant. Case referred to an assessor for the assessment of damages.