## THE ENERGIA.

## THE WILD PIGEON.

### PHILLIPS et al. v. THE ENERGIA.

### INSURANCE CO. OF NORTH AMERICA v. THE ENERGIA and THE WILD PIGEON.

(District Court, S. D. New York. April 4, 1893.)

1. COLLISION—STEAM AND SAIL—CHANNEL—ARTICLE 21.
    A schooner bound eastward from South Amboy at first designed to go up through the Narrows, but afterwards changed her course to go out by way of Sandy Hook. The steamship Energia was going down the port side of the Cut channel, and, near buoy C 4, collided with the schooner. She claimed that the schooner's change to go out by way of the Hook was a violation of her duty to hold her course. The evidence indicated that the schooner changed her heading when a mile and a half or two miles distant from the steamer. *Held,* that the steamer was in fault for failing to take the proper maneuvers to avoid the schooner, and also for going needlessly down the port side of the Cut channel, contrary to article 21 of the rules of navigation.

2. BILL OF LADING—NEGLIGENCE—STIPULATION TO ADOPT FOREIGN LAW VOID.
    A stipulation in a bill of lading provided that "the liability of the carrier shall be governed by the law of England, with reference to which this contract was made." *Held,* that such stipulation, so far as it related to the invalid stipulation for exemption from liability for negligence, was also invalid.

In Admiralty. Libels for collision. Decrees for libelants.

Owen, Gray & Sturgis, for the Wild Pigeon.
Wing, Shoudy & Putnam, for the Energia.
Butler, Stillman & Hubbard, for the insurance companies.

BROWN, District Judge. The above libels were filed to recover damages arising from a collision near buoy C 4, in the "Cut Channel" of the Lower bay, at about 11:30 o'clock in the forenoon of December 22, 1892, between the steamship Energia, outward bound, and the two-masted schooner Wild Pigeon, laden with coal, bound

eastward from South Amboy. Both vessels were damaged. The steamship had some plates broken and was obliged to return to New York, discharge a part of her cargo, and make repairs; while the schooner after collision drifted on the shoals to the eastward of the Cut channel, where she sank and became a total loss. The first libel is to recover the value of the schooner and cargo; the second was filed by the underwriters upon the cargo of the Energia, to recover for damages to the cargo on board the steamship, which, upon abandonment, was settled for by the insurers, the amount having been actually paid since the filing of the original libel. A supplemental libel was filed on the 14th of February, alleging payment, to which an answer was filed setting up the exceptions in the bill of lading as respects negligence, and its stipulation that "the law of England should govern the contract."

The Cut channel, in which the collision occurred, is about a thousand feet in width, by 30 feet in depth at low water. The tide was about one-third ebb at the time of the collision, so that the actual depth of water in the Cut channel was about 33 feet. The Energia was a steamship of about 2,000 tons register, 337 feet long, and at that time drew $23\frac{1}{2}$ feet of water. The wind was west-northwest, and the steamer was proceeding along the easterly or port side of the Cut. The schooner, on first coming out from South Amboy, had designed to go up through the Narrows and out by way of the Sound; but upon a more favorable turn of the weather, the master concluded to go out by way of Sandy Hook, and thereupon hoisted his mainsail and took a course of east by south, a change of several points to the starboard of his previous course. In behalf of the steamer, it is claimed that this change of course was a violation of the obligation of the sailing vessel "to keep her course."

I have carefully examined all the arguments of counsel in support of this contention and the evidence bearing on it, and am unable to sustain it. To say nothing of the testimony of the schooner's witnesses, who assert that this change of course was made several miles from the Cut, it is manifest from the testimony of the pilot and of the second and third officers of the steamer, that the schooner's mainsail was up, and that she was heading out to the eastward when at least a mile and a half or two miles distant. The heading spoken of by them at that time was a heading manifestly to go out by way of the Hook, and not a heading to go up through the Narrows. They speak of some minor changes in the schooner's heading made afterwards; but the evidence on this point is very indefinite in itself, and manifestly is not sufficient to outweigh the testimony of those in charge of the schooner. I am satisfied that they made no substantial change in their course after heading to go out by way of the Hook, and nothing more than the usual yawing of a schooner sailing before the wind, until the hard a-port helm just before collision when in extremis—a maneuver which was quite justified by the circumstances at that moment.

The argument based upon the supposed shortness of the time required to stop up the hawse pipe, is altogether inconclusive, because the time required for this purpose is quite variable and indefinite; and the schooner might easily have gone one or two miles while that work was being done.

The manifest causes of the collision were (1) the failure of the pilot to recognize, or to endeavor to perform the duty of the steamship to keep out of the way of the sailing vessel. He was evidently expecting the schooner to maneuver so as to keep out of the steamer's way, and gave the schooner any number of whistles, as though she were a tug on his port hand, instead of taking the proper maneuver obligatory on the steamer; (2) in going without reason or necessity, and contrary to article 21 of the rules of navigation, on the port side of the Cut channel, instead of on the starboard side, as that rule requires; a position in which, as he says, he was unable to reverse sooner than he did, viz. within about half a length of the place of collision on account of his liability to drift ashore on the port side of the Cut, or to foul the buoy chain with his propeller. The reasons assigned for getting into this position in the Cut have not the least weight. There was absolutely nothing to prevent the steamer, even when the vessels were within a third of a mile of each other, from directing her heading to starboard, taking a proper place in the Cut channel, and reversing full speed in abundant time to let the schooner pursue her course and pass ahead of the steamer, as she had a right, by law, to do. The buoys in sight plainly marked the boundaries of the channel, and there was nothing in the wind or the tide that presented any serious obstacle to maintaining the ship in any part of the Cut channel that the pilot was really disposed to navigate.

As respects the libel filed by the insurers and the exemption of the ship from responsibility by negligence, the invalidity of such exceptions, as respects contracts made in this country, has been finally adjudged by the supreme court in Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. Rep. 469. Among the numerous provisions of the bill of lading was an additional one, No. 8, as follows:

"(8) The liability of the carrier under this bill of lading shall be governed by the law of England, with reference to which this contract was made."

The ship had been chartered by the owners under a written charter to Barbour & Co. The charter contained an exemption from responsibility for negligence, but no provision like that of No. 8 in the bill of lading. As between the charterer and the owners, this bill of lading would have no force to change the legal rights of the parties under the charter; it would be only a memorandum receipt of goods on board; and the evidence shows that the use of this printed form of bill of lading was not made with the intention of making any change in the legal rights of the parties. See The Chadwicke, 29 Fed. Rep. 521, 524; Steamship Co. v. Theband, 35 Fed. Rep. 620, affirmed on appeal, Crenshawe v. Pearce,

37 Fed. Rep. 432, 434, affirmed as to this point on appeal, 43 Fed. Rep. 803.

By the bills of lading the cargo in question seems to have been shipped by Carleton & Moffit. The vessel was bound for Shanghai, China; and the cargo was deliverable there. The relations between Barbour & Co. and Carleton & Moffit, both of New York, do not appear. The charter was one of affreightment, for a lump sum. The objections to the validity of stipulations exempting common carriers from responsibility for negligence, namely, the policy of the law of this country, the unequal situation of the parties, and the lack of sufficient evidence of actual intention and freedom of contract, apply precisely the same to a stipulation for the adoption of the law of another country, as to the original exemption. That stipulation is plainly nothing but a further device to secure the same unlawful exemption as the preceding exemption clause, which could not stand alone. The Brantford City, 29 Fed. Rep. 373, 396.

Such an additional stipulation, so far as it relates to the same exemption of liability for negligence, must fall with the latter. Nor can a rule of law founded on public policy be set aside in our own courts by any stipulation to adopt the law of another country.

Decrees for the libelants in each case, with costs.