THE GUILDHALL.[1]

SCHULZE-BERGE et al. v. THE GUILDHALL.

(District Court, S. D. New York. November 6, 1893.)

1. SHIPPING—CARRIERS—BILL OF LADING—EXCEPTIONS—NEGLIGENCE.
    A shipowner cannot by stipulation exempt himself from the consequences of his own negligence. Such stipulations are held void in this country, as contrary to public policy, and as not being evidence of any contract, so far as the shipper or consignee is concerned.

2. SAME—CONTRACTS CONTRARY TO PUBLIC POLICY—FOREIGN LAW.
    Contracts contrary to the public policy of this country cannot be enforced or upheld in our courts, wheresoever made.

3. SAME—STIPULATION EXEMPTING FROM NEGLIGENCE—EVIDENCE.
    The insertion of a stipulation against the consequences of negligence in a bill of lading, and the receipt of the goods under such bill, are not sufficient evidence of any such assent to the stipulation by a shipper or consignee as to make it a contract.

4. SAME—DAMAGE TO CARGO—NEGLIGENT COLLISION — STIPULATIONS EXEMPTING FROM LIABILITY.
    Where cargo is damaged by reason of the shock of a collision caused by the negligence of the shipowner, such owner cannot rely on the exceptions of the bill of lading, exempting the ship from liability for damage caused by "insufficiency in strength of packages, breakage, * * * collisions, perils of the seas," etc.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

**5. SAME—DAMAGE BY COLLISION—RECONDITIONING CARGO—NEGLIGENCE.**

When a vessel, after collision, opened her forward hatches, and re-conditioned the cargo there, under direction of her owners, but did not open her after hatches at all, being unsuspicious of any damage there, it was held that such failure to examine the condition of the after cargo was negligence in her owners, who were therefore liable for any damage caused thereby.

**6. SAME—INTEMPERATE CAPTAIN—NEGLIGENCE OF OWNER.**

It is negligence in a shipowner to appoint as captain a man known to be intemperate, or whose intemperate habits might have been ascertained on reasonable inquiry.

In Admiralty. Libel for damage to cargo. Decree for libelants.

Butler, Stillman & Hubbard and Mr. Mynderse, for libelants
Convers & Kirlin, for respondent.

BROWN, District Judge. The above libel was filed to recover for damage to nine barrels of alizarine out of a cargo of 250 barrels brought from Rotterdam to New York by the steamship Guildhall in November, 1892.

The steamer left Rotterdam on the 15th of October. Early on the morning of the 16th she came into collision with the steamship Myra, off the English coast, and incurred damages which made it necessary for her to put into London for repairs. Upon a suit in the English courts, the Guildhall was held solely to blame for the collision; and under the stipulation and admissions in this case, that fact must be assumed here.

After repairs, the steamer sailed from London on the 6th of November, and arrived in New York on the 25th. On the discharge of the cargo, two barrels of the alizarine were found wholly empty, the heads being gone; seven others were partially empty, the hoops having been shoved forward so that the chimes were loose. The log leaves no doubt that the vessel experienced very tempestuous weather on her voyage between London and New York.

The libelants contend that the damage was primarily caused by the shock of collision; and that the damage was afterwards further increased by the failure of the claimants to examine the cargo and to recondition the barrels in London, as might and should have been done on the ship's arrival there; so as to prevent the additional loss by leakage from the seven barrels during the voyage.

The claimants contend that the damage was caused solely by the tempestuous weather; that is, by the excepted "perils of the seas;" or that under the evidence, it is at least quite as likely to have arisen from that cause as from the collision; that the tempestuous weather was quite sufficient to account for the loss; and that if it be uncertain which was the cause, and as likely to be the one cause as the other, the action, according to the rule laid down in Clark v. Barnwell, 12 How. 272, 280, and in The R. D. Bibber, 8 U. S. App. 42, 2 C. C. A. 50, 50 Fed. 841, should be dismissed.

As to the cause of the damage, I feel bound to give conclusive weight to the testimony of the first and second mates of the Guildhall, who, on their original examination on December 15th, about

three weeks after arrival in New York, both state that the damage was done by the shock of collision; that there was no other way that they could account for it. The damage, as the first officer ·says, "showed itself in the ends, mostly; all in the ends; all the damage in the ship was end-on damage." The barrels were stowed with ends fore and aft, and on discharge were found "slightly shifted fore and aft;" not at all from side to side.

The answer of the claimants also states that "whatever loss there was, was caused by the shock of the said collision, or from one or more of the other perils excepted in the bills of lading;" and no allusion is made in the answer to tempestuous weather as the probable cause of damage. The defense relied on was the exceptions in the bill of lading, which embraced "insufficiency in strength of packages, breakage, and any neglect or defaults of the master, mariners, or others in the service of the owners, collision, perils of the seas," etc., and provided that "the rights of the parties in relation to the carriage and delivery under the bill of lading should be governed by English law." It was not until four or five months after his original testimony that the first officer, upon re-examination on May 5th, suggested tempestuous weather and shifting of the cargo forwards by pitching, as a cause of the loss. They had two gales, he says, of about 36 and 18 hours each:

"Question. In which direction was the cargo shifted, sidewise or forward, or both ways? Answer. Forward, as if it was caused by the pitching of the ship, so you would think, and the casks had slid off their tier. You often discover that, even with boxes. They will slide off either forward or aft. You will often discover that."

On cross-examination he says he does not desire to change his former testimony; that he intended in his December examination to tell the truth; and that "his memory then would be much more clear." That the damaged barrels, however, had not slid off the tiers, is proved by the stevedore who discharged them. He says: "The stowage was good; the tiers were perfect; but there were one or two barrels damaged in each tier." "The casks were strong, heavy, oak casks, with iron bands." The second mate testified that there was no shifting of the cargo sideways. Though the weather was, doubtless, heavy and tempestuous during the two gales, the whole evidence leaves no doubt in my mind, that the primary cause of the damage was the collision, as the officers originally testified.

If the owners were in no way responsible for the negligence contributing to the collision, the terms of this bill of lading, if valid, would, therefore, absolve them and their vessel from responsibility for the damage. These stipulations are valid by the law of Rotterdam and of England. But the obligation of this steamer, as a common carrier, was to deliver her cargo safely in this country, at the port of New York. As against the consignee and owner here, she cannot commit torts on the high seas against his property with impunity, nor justify such torts, except by some valid contract, proved according to the law of the forum. By numerous decisions of the supreme court of the United States, stipulations

like these, inserted by a common carrier in a bill of lading, are, first, void as against public policy: Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 441, 9 Sup. Ct. 469; and secondly, they are not evidence of any contract to that effect on the part of the shipper, or consignee; because unreasonable, and not having the necessary element of voluntary assent. Railroad Co. v. Manufacturing Co., 16 Wall. 318; Railroad Co. v. Lockwood, 17 Wall. 357, 359; Express Co. v. Caldwell, 21 Wall. 266; Railroad Co. v. Stevens, 95 U. S. 659; The Energia, 56 Fed. 124. Contracts against the public policy of this country cannot be enforced or upheld in our courts wheresoever made. Lewisohn v. Steamship Co., 56 Fed. 602; Oscanyan v. Arms Co., 103 U. S. 261. Such, also, seems to be the law of England. Hope v. Hope, 8 De Gex, M. & G. 731, 743; Rousillon v. Rousillon, 14 Ch. Div. 351, 369. In the latter case Mr. Justice Fry said:

"It appears to me, however, plain on general principles that this court will not enforce a contract against the public policy of the country wherever it may be made. It seems to me almost absurd to suppose that the courts of this country should enforce a contract which they consider to be against public policy simply because it happens to have been made somewhere else."

If this be the law of England, then, under the very terms of the clause last above cited from this bill of lading, the preceding stipulations, though valid abroad, should not be enforced here, because contrary to our public policy. This principle is recognized and embodied in the first two sections of the act of congress, approved February 13, 1893; 27 Stat. 445, c. 105.

It is further necessary that any contract of exemption shall be proved, as a matter of evidence, according to the law of the forum. Hutch. Carr. § 45; Hoadley v. Transportation Co., 115 Mass. 304. But since by the federal law of this country, as above stated, the insertion of such stipulations in the bill of lading, and the receipt of the goods under it, are not sufficient evidence of any assent to them, by the shipper or consignee, the exemptions alleged fail to be established as a contract by any sufficient legal proof. See The Brantford City, 29 Fed. 373, 393, 394, and cases there cited; The Energia, supra.

It is unnecessary, however, to pursue this branch of the case further; because, upon the evidence, the entire damage, whether arising directly from the collision, or afterwards from the nonrepair of the injured barrels, appears to be so connected with the negligence of the owners, that the exemptions are insufficient to absolve them, even if treated as valid, and applied according to the English law.

As to the loss subsequent to the collision, it appears that the barrels in question were stowed in hatch No. 3; that a very slight inspection, on removing the after hatches in London, would have shown that these casks were damaged and needed repair. Forward, the cargo was examined; and being found injured by the collision, about one-third of the whole cargo was discharged, warehoused, and reconditioned. No damage, however, having been suspected aft, that part of the ship where the libelants' goods were stowed was not examined. Hatches Nos. 3 and 4 were not opened. Having notice of

damage to the cargo by collision, it was at the vessel's risk that even the most superficial examination, by removal of the after hatches, was neglected. This negligence is attributable to the owners. By the stipulation it was agreed that the steamer was repaired and dispatched from London "under the supervision of her owners." The captain had been lost overboard and drowned on the day following the collision, and on arrival at London the ship's crew were mostly discharged, and the officers, as Guthrie says, "had nothing to do with the cargo there." The owners, through the dock company, took charge of overhauling and reconditioning both ship and cargo. As exceptions of responsibility for negligence are strictly construed, no negligence on the part of the owners is included, unless expressed. Macl. Shipp. 409, 509, 510; Hayn v. Culliford, 4 C. P. Div. 182; Taylor v. Steam Co., L. R. 9 Q. B. 549. No such clause being found in this bill of lading, the owners are not exempted from liability for such subsequent damage as proceeded from the lack of examination and reconditioning of the damaged casks.

Still further, it seems to be impossible in this case to acquit the owners of negligence in not manning the ship with a competent master. The evidence leaves no doubt that this master was of such intemperate habits, and so addicted to intoxication, as to render him wholly unfit for his position. He was appointed, and took charge of the steamer for the first time, at Sunderland, England, the registered home port of the vessel, whence she sailed to Rotterdam for this voyage. The master was intoxicated when the vessel left Sunderland; he was drunk several days while she was loading in Rotterdam, though apparently not at the moment of leaving Rotterdam; and he was intoxicated at the time of the collision. He was on the bridge for about two and a half hours after leaving Rotterdam, and then went to his room, left the navigation to the officers, and gave no further attention to the ship. The evidence does not admit of the supposition that this drunkenness was a rare, or an accidental, or an exceptional occurrence; and the appointment of such a man to command, is presumptive negligence in the owners, since it cannot be supposed that on an appointment at the home port, reasonable inquiry would not have disclosed his unfitness. The burden of proof is on the owners to prove due diligence in this regard, and that has not been proved. The duty of the owners to exercise due diligence properly to man and equip the ship by the appointment of a competent master, is also recognized by the act above cited, (27 Stat. 445, § 2,) and from and after July 1, 1893, all stipulations seeking to lessen or to avoid that obligation are declared unlawful.

The lack of a competent master cannot be deemed immaterial. The collision took place before daylight, at about 5 o'clock in the morning. The first officer was below. It was the captain's watch, and it was his business to be either on deck or within immediate call and capable of directing the navigation in any emergency. He was neither; but intoxicated below. The navigation was in the sole charge of the second mate; and when the ship's whistle was found to be choked, so that she could not answer the Myra's signal, and the Myra's changing lights foreboded danger, while still a half or

three-quarters of a mile away, and there was instant need of a master's skill and experience, he was not in a condition to be called, but "stupefied with drink;" and when he got on deck a few moments after collision, he gave a wrong order, which the second mate was obliged to reverse. Soon after, he went to his berth, leaving the officers to bring the ship into port; and on the following day, before arrival, he fell overboard and was drowned. It was by the owner's fault that a competent master was not on board. The owners must, therefore, answer for the collision, since it cannot be shown that a competent master, during the master's watch, would not have avoided this collision. The Pennsylvania, 19 Wall. 125, 136; The Bolivia, 1 C. C. A. 221, 49 Fed. 169, 172.

Decree for the libelants, with costs, with a reference to compute the damages, if not agreed upon.