THE GLENMAVIS.

SPRECKELS SUGAR-REFINING CO. v. THE GLENMAVIS.

(District Court, E. D. Pennsylvania. August 20, 1895.)

No. 8.

1. SHIPPING—DAMAGE TO CARGO—UNSEAWORTHINESS.

Where, at the end of a voyage, the water pipe leading to one of the water-ballast tanks was broken, so that in an attempt to fill the tank the water ran into the hold, and damaged the cargo, *held*, that there was a breach of the implied warranty of seaworthiness, in that, at the beginning of the voyage, the casing inclosing the pipe consisted only of a long board box, without corner posts or other means of stiffening or strengthening it against the tendency to work loose from bending and springing through

pressure of the cargo and the motions of the vessel, and was fastened at the bottom, and probably also at the top, merely by cleats.

2. SAME — STIPULATION AGAINST LIABILITY FOR NEGLIGENCE — LAW OF FLAG AND PLACE OF CONTRACT — PUBLIC POLICY.

A bill of lading made in Germany in behalf of a British ship, prior to the act of congress of 1893, relating to the liability of shipowners, contained a clause exempting the ship and carrier from liability for negligence in the navigation of the vessel, and a further provision that the law of the flag should govern. *Held* that, on grounds of public policy as established in this country at the time the contract was made, the courts of the United States would refuse to enforce the stipulation respecting negligence, although it was valid under the laws of both England and Germany.

3. SAME — NEGLIGENCE IN "NAVIGATION."

Quære: Whether negligence in filling water-ballast tanks after arrival in port, for the purpose of facilitating the discharge of cargo, is negligence in the "navigation" of the vessel, within the meaning of an exception in the bill of lading?

This was a libel by the Spreckels Sugar-Refining Company against the British steamship Glenmavis to recover for damage to cargo.

Morton P. Henry and Albert B. Roney, for libelant.

Henry R. Edmunds and Convers & Kirlin, for respondent.

BUTLER, District Judge. The respondent having contracted to carry sugar from Hamburgh to Philadelphia, received the cargo in good condition, and delivered a part of it seriously damaged. She must therefore compensate for this loss, unless she can excuse herself from liability. She points to the following clause of the contract:

"The ship and carrier shall not be liable for the loss or damage occasioned by the perils of the seas or other waters, * * * for any latent defect in hull, machinery, or appurtenances, for accidents of navigation, of whatsoever kind, even when occasioned by the negligence, default, or error in judgment of the master, mariners, or other servants of the shipowner, * * * nor for any loss or damage occasioned by causes beyond his control, steamer having liberty to coal in U. K. * * * Any questions arising under this bill of lading to be settled according to the laws of the flag of the vessel carrying the goods."

She follows this with an assertion that the damage resulted from "perils of the sea or other waters," or "accident of navigation," and that it is therefore covered by the exemption clause cited; and furthermore that if it did not so result, but is ascribable to negligence of the master or crew, this negligence is also covered by the clause.

Thus it becomes necessary to determine how the damage occurred. Fortunately, there is little room, if any, for controversy respecting this. On reaching Philadelphia the ship undertook to fill her aft water-ballast tanks, to improve her situation for unloading other cargo carried; and in consequence of a break in a pipe connected with one of the tanks, the water turned on ran into her hold among the sugar. The observance of proper care in filling the tanks would have discovered the break, and avoided the damage. No care whatever was exercised in this respect. The voyage had been somewhat tempestuous, and the pipe, in consequence of its situation and the condition of its casing, was liable to break, especially on such a voyage; and yet the water was turned on and allowed to flow for

three-quarters of an hour after the tanks were full, without the slightest effort to determine whether it was overflowing into the hold or not. About two hours after it had been turned on a sounding was made, and although the water was still allowed to flow in, no further measures were taken to ascertain the situation until the following morning, when the hold was found to be flooded, several feet in depth. Continuous soundings until the water was shut off, or opening the sluiceway doors, to allow an escape into the engine room, would have avoided all danger.

The case presents but two questions of fact which need be considered: (1) Should the breaking of the pipe be attributed to "peril of the sea or other water," or to unseaworthiness of the ship? And if it should be attributed to the former, then (2) was there carelessness in filling the tanks at Philadelphia? As respects the latter I need add nothing to what has been said. The question does not seem debatable. As respects the former there is room for doubt; but I think the weight of the evidence is against the respondent. Conceding that the burden of proof is on the libelant I think the evidence warrants a conclusion that the ship was unseaworthy in this respect. The experts called disagree, as usual. But when it is borne in mind that the respondent *warranted* the ship fit and safe in all respects for the voyage and cargo—not simply that she seemed to be so, exhibiting no defects to common observation, or that she was honestly believed to be so, but that she actually was fit and safe—and the situation of the pipe and the condition of its casing are considered, it seems difficult to avoid the conclusion that the warranty was broken. The time when the pipe separated, and precisely what caused it, cannot be known. It seems reasonable to believe that it occurred on the voyage. The fact that it broke does not of itself warrant a belief that it was defective when the vessel started; because if there was nothing else to consider, the break might, and should, be attributed to "peril of the sea." And the same may be said of the displacement of its casing. I am not satisfied that there was any defect in the pipe on starting. I cannot avoid the conclusion, however, that the casing was imperfect and unsafe at that time. Casing was essential to the safety of the pipe. Without it the latter would clearly have been insecure, and the ship have been subject to condemnation on that account. Any shifting of the cargo, such as might result from settling, or the motion of the ship in ordinary weather would be likely to break it, if exposed. The sole object of the casing is to afford protection against such danger. It is necessary to this end, therefore, that the casing shall be very substantial, and be securely fastened in place. If defective in either respect the casing tends to increase the danger, for if it gives way the sudden blow thus inflicted would be more likely to break the pipe, than the gradual pressure from the cargo. After a careful reading of the testimony describing this casing and its fastenings, I am satisfied that it was insufficient; that it was unsubstantial, if not flimsy. I believe that in the settling which ordinarily occurs in such a cargo, or the strain to which the ship is subjected in ordinary weather, on such a voyage, it was likely to give way, as it did. How it was

secured at the top is uncertain; the evidence is conflicting. It was probably cleated there as well as at the bottom; but it would seem difficult, if not impossible to secure such a casing as this—which consisted simply of a long board box, without corner posts, or other means of stiffening and strengthening—in such way that it would not work loose in bending and springing, as it necessarily must, from the pressure of the cargo and the motions of the vessel even in ordinary weather. It was the respondent's duty to have the pipe and casing absolutely safe; and in this I believe she failed.

There is another ground, however, on which the case may be rested, possibly with greater safety. I have found the respondent guilty of negligence in filling the tanks, which contributed directly to the damage; and this negligence deprives her of the exemption from liability for injury from sea peril or accident of navigation, unless the consequences of such negligence are also covered by the clause cited. The respondent avers that they are so covered; that the negligence was connected with the navigation of the ship, and is therefore within the terms of the clause. Possibly this averment is true; but I seriously doubt it, notwithstanding what is said in The Castleventry, reported in respondent's brief, Appendix B.[1] Granting it to be true, however, and that the negligence is therefore, within the terms, will our court enforce these terms? Such a provision is unlawful here. If its unlawfulness arose from conflict with our

---

[1] "Appendix B" is herewith reprinted from respondent's brief.

Appendix B.

Hanseatic Gericht (Hamburg).

In the Action of Sievenright, Bacon & Co., owners of the English Ship Castleventry, versus Anson Nielsen & Co., of Bremen.

BY THE COURT. Plaintiffs' claim for freight has been recognized by defendants as correct in itself, and especially as regards the amount thereof. On the other hand, defendants raise a counterclaim for compensation of damages caused to them by water having penetrated into the cargo of rice during its discharge from plaintiffs' ship Castleventry, at the port of destination, Geestemunde, whilst filling the water tanks, whereby 900 bags of rice have been spoilt. Defendants hold plaintiffs responsible for said damages, whereas plaintiffs dispute any such liability.

The first point in dispute between the parties of this suit is whether the legal connections between them have to be regulated either by the bill of lading only or by the charter party as mentioned in the bills of lading. (The court hereafter comes to the conclusion that only the bill of lading is to be considered as the basis of the legal connections between parties.) In due consideration of these facts, only that clause in the bill of lading is to be looked upon as conclusive, in the legal connections of parties in dispute, according to which plaintiffs have freed themselves from risks and accidents of sea and navigation. As regards any damages caused by default of the ship's crew, full liability exists to the extent intended by the act.

The second point in dispute between the parties in this suit concerns the question whether in the case now before the court there is any reason to speak of an accident of navigation. This question must be answered in the affirmative. The county court is right to suppose whilst referring to said verdict of the imperial supreme court (volume XI., No. 21), that the accidents of sea and navigation not only include those accidents occurring in the port of shipment, but also those occurring in the port of destination up to the time of final discharge of cargo. Any accident occurring in handling the tanks, especially whilst filling same, has to be treated as an accident due

statutes, or violation of our sense of good morals, we, certainly, would not enforce it.    Judicial decisions are, however, as effectual in establishing the law as the enactment of statutes.    The controlling fact is the unlawfulness of such contracts here; that they are forbidden by our laws.    It is unimportant whether the laws rest upon such decisions or upon statute.    We hold them to be in conflict with the public interests, and, therefore, in violation of sound public policy.    Declaring them immoral would add nothing to the reason for holding them unlawful.    In Bissell v. Railroad Co., 25 N. Y. 442, 29 Barb. 602, however, Judge Denio denounced them as immoral.    The stipulation that the parties shall be subject to the laws of England is unimportant, as it adds nothing to the implication which would arise in its absence.    The ship bore the English flag, and the laws of Germany, where the contract was made, as well as those of England, sustain such provisions.    That the intent of the parties in this regard is thus *expressed* is, therefore, immaterial.    In every instance where the courts have declared such stipulations void, it has, of course, been against the express agreement of the parties.    We have determined that such contracts are harmful and wrong; that they tend to encourage negligence, and justify oppression; that they affect injuriously not only the immediate parties, but the public at

to and caused by navigation, and therefore has to be considered to fall under the perils of navigation.    This opinion 'has been expressed by this court in a verdict given 8/2/92 (Ann. C., 1892, No. 20; cf. No. 89), which happened in a port of shipment, and has been confirmed by the supreme court.    It can therefore not be seen why the same points of view which are held conclusive for filling a tank in the port of shipment shall not hold good for the same manipulation if performed during the discharge of cargo in the port of destination; that means at a time during which the vessel still served as means of transport, and therefore the voyage had not been terminated as far as the cargo is concerned.    Consequently, in itself, an "accident of navigation" must be considered to exist in this case.

However, by the acknowledgment of this fact it has not yet at all been decided that plaintiffs are not liable for said accident; for the discharge from all liability only comes into operation under the proviso that the "accident of navigation" has been caused, without any blame being attached to the owners, the master, or crew.    There can be no doubt that, if such a clause as in the present case (which, properly speaking, is nothing else but a circumscription and definition of the legal liability for the act of God) is adopted in the bill of lading, it only creates a change in the liability to procure proof, but does not mean to state right off that the legal liability shall be excluded without any examination of the cause of the accident.    In consequence of this clause having been agreed upon between parties, not the freighter (as customary in regular cases) has to prove the act of God; but the charterers (the defendants in this action) have to assert and prove a default of the party opposite if they want to succeed in obtaining from plaintiffs a compensation for damages.    Such a default has actually been asserted by defendants in two directions.    They firstly raise the assertion that the master has unjustly and in a guilty manner caused the filling up of the water tanks at the port of destination, Geestemunde, which labor has nothing at all to do with the present voyage, but only must be considered as means of preparation for a new voyage.    The filling has taken place during the time that a part of the cargo was still in the hold, and defendants blame the master especially that whilst filling the tanks he had acted uncareful, because, contrary to cautions made to him, he did not wait till last with the discharge of that part of the cargo stowed in the fore lower hold.    In the second line, defendants consider the owners liable because the damage

large; and that they are therefore unlawful. Why then should we lend our aid for the enforcement of such a contract because it is made abroad, instead of at home? I can see no sound reason why we should. Of course, it is true that contracts are enforceable, generally, according to the law of the place where they are made, or are to be executed, or such other place as the parties may stipulate, or circumstances may show they contemplated. Where, however, their provisions conflict with justice and sound public policy as declared by the laws of the jurisdiction, where their enforcement is sought, it is otherwise. Story, Confl. Laws, §§ 38, 244; Rousillon v. Rousillon, 14 Ch. Div. 357; 2 Kent, Comm. 458. This question was before the district court for southern New York in The Hugo, 57 Fed. 403, and was decided against the carrier. That case is now pending on appeal, as I am informed, in the supreme court. The question was also involved, and decided in the same way, in The Guildhall, 58 Fed. 796. The question was also involved, I think, and was similarly decided by the supreme court, in Railroad Co. v. Lockwood, 17 Wall. 357. In the latter case the contract was for carriage on *land*, but no difference exists, in the respect under consideration, between such a contract and one for carriage on water. The Montana [Liverpool, etc., Steam Co. v. Phenix Ins. Co.] 129 U.

of the cargo has been caused by the untight state of the tanks, and therefore is the result of an unfit condition of the vessel.

Plaintiffs deny any liability in both directions. They do so justly, as regards the latter point,—that means to say, as far it concerns the asserted unseaworthy condition of the vessel. It will suffice in this direction to point to the reasons of the judge who dealt with this case in a former instance. Said judge comes to the conclusion that, if actually an unfit state of the tanks has existed, it could not prejudice the seaworthiness of plaintiffs' steamer for the completed voyage, as no water ballast has been used during said voyage. Whether or not any blame must be attached to the master's dealings cannot be decided at present by the evidence now before the court.

Plaintiffs, contrary to defendants' statements, assert that the filling up of the water tanks during the time of discharging the cargo is not to be considered as a kind of preparatory work for the next voyage, but this was a necessary and requisite part of work of the old voyage in consideration of the vessel's construction, and in consideration of the fact that the weak and thin bags of rice would burst and tear much easier the more the vessel's body was out of the water and the longer the planks had to be constructed for discharging the cargo. It will therefore become necessary, as regards this point, to obtain further proof, which has been offered on both sides, and according to the result of this only point in dispute it must be decided whether the master must be blamed or not.

I hereby certify that the foregoing is a true and correct translation of an extract from the "Hanseatische Gerichtszeitung," dated April, 1894.

Hamburg, November 5, 1894.

[Sd.]            R. Breitruck, Sworn Translator.
[Seal.]

We, the undersigned German lawyers and members of the bar of the Hanseatic court of appeal at Hamburg, do hereby declare and certify that the foregoing translation is a true and correct one, as well to the wording as to the meaning of the decision, and we further certify that this decision does state the law of the empire of Germany up to date, and is one of the leading cases on the question decided therein.

Hamburg, November 7, 1894.     Drs. Nolte and Schroeder.
                  Dr. Gustav Nolte.

S. 397 [9 Sup. Ct. 469]. The law of New York, where the contract was made, authorized it, and yet the supreme court held it to be contrary to sound public policy, and therefore refused to recognize and enforce it. It will be seen by reference to the report of this case that the eminent counsel who represented the carrier rested their contention exclusively on the fact that the law of New York, to which the parties impliedly bound themselves to submit, authorized the contract. In The Montana, the contract was for carriage by water; the terms were similar, and the decision was the same—the court citing Railroad Co. v. Lockwood, as controlling. I do not see how these cases can be distinguished in principle from the one before me. If the parties there had expressly stipulated for the application of the laws of New York, the result must, of course, have been the same. The stipulation would not have added anything to the force of the express agreement for exemption, or the implied agreement to abide by the laws of New York. The fact that these contracts were made in New York, and not in England, affords no just ground for a distinction; the stipulations were as valid by the laws of New York as this is by the laws of England; and no reason can be seen why the laws of New York should not have been allowed to prevail in those cases, and the laws of England should in this. That state is as distinct and independent a jurisdiction, in this respect, as England is, with the same right to authorize such contracts. Proceeding upon this view the supreme court of Pennsylvania, in Forepaugh v. Railroad Co., 128 Pa. St. 217 [18 Atl. 503], decided that such contracts made in New York are enforceable in Pennsylvania, (though invalid if made here) a majority of the judges disregarding the decisions in Railroad Co. v. Lockwood and The Montana as respects the question of public policy, while a minority dissented in this latter respect.

In the cases cited by the respondent, generally, the precise question before me does not seem to have been raised or considered, though in some of them it seems to have been involved. I am not referring to cases in state courts. Very little weight should, I think, be attached to the fact that the judge who delivered the opinion in The Montana pointed to the circumstance that the contract there involved was not made in England. It by no means follows that the decision would have been otherwise, if it had.

Counsel for the respondent suggested that our statute of 1893, relating to navigation, etc., shows a change in our views of public policy in this regard. That statute relieves vessels and owners from the consequences of negligence thereafter, of masters and crews under specified circumstances, giving to shippers, as compensation for this loss of security, the carriers' responsibility for proper care in the selection of such agents. It will be a mistake, I think, to suppose that a mere formal or perfunctory discharge of this duty of selection will satisfy the terms and spirit of the statute. We must, however, deal with the question in hand according to the law as it existed when the right of action accrued, which was antecedent to the date of the statute.

A decree must be entered sustaining the libel.