BOTANY WORSTED MILLS v. KNOTT.

WINTER et al. v. SAME.

(District Court, S. D. New York. October 15, 1896.)

CARGO DAMAGE — WOOL — SUGAR DRAINAGE FORWARD, BY CHANGE OF TRIM — HARTER ACT — "MANAGEMENT OF THE SHIP" — EXEMPTION FOR NEGLIGENCE UNDER FOREIGN LAW VOID.

Bales of wool stowed at Pernambuco in the forward compartment of the steamship P. P. was damaged by the forward drainage of wet sugar next aft, caused by a change in the trim of the ship through changes in loading at Para, a port of call. The bill of lading contained exceptions of damage from stowage and negligence, and provided that the contract should be governed by the law of the flag (English). The defendant pleaded also exemption under the Harter Act (2 Supp. Rev. St. 81, § 3): *Held* (1) that it was negligence as respects the general loading and stowage of cargo to permit the ship, in the absence of forward scuppers or a tight bulkhead, to get down by the head at Para, so that the wool would become damaged by the sugar draining forward; (2) that this negligence was not "in the management of the vessel" within the meaning of the third section of the Harter Act; but, being the merely incidental result of the loading and stowage of cargo at Para, fell within the first section of that act; and the harmonious construction of that act requires that that section in a case like this should prevail; (3) that the provisions of the bill of lading were void under our law, British jurisdiction never having attached.

These were libels filed, respectively, by the Botany Worsted Mills, and by Henry P. Winter and others, against James Knott, to recover for damage to cargo shipped on board the Portuguese Prince, which is owned by respondent.

George A. Black and W. Mynderse, for libellants.
Convers & Kirlin, for defendant.

BROWN, District Judge. The respondent, the owner of the British steamship Portuguese Prince, is sued in the above libels for damages to two lots of wool in bales shipped on board at Pernambuco, arising from contact of the bales with sugar drainage upon the voyage to New York, where she arrived on March 30, 1895.

The bales of wool were stowed on end in the No. 1 (forward) compartment of the 'tween decks; and wet Pernambuco sugar, from which there is always some drainage, was stowed on the same deck, next aft of the wool, and separated from it by a tem-

porary bulkhead. There was sufficient means of escape for the sugar drainage, provided it ran aft as designed; and it did run aft so long as the ship was not down by the head. But the ship called at several ports after leaving Pernambuco, among others, at Para; and through changes in the cargo loading at Para she was considerably down by the head when she left that port on March 10th, and so continued until her arrival at Port of Spain on March 18th, where the error in her trim was corrected. But during this interval the sugar drainage ran forwards, where it had no means of escape; and the temporary bulkhead not being tight, the drainage ran under or through the temporary bulkhead and accumulated forward of it so as to extend above the dunnage on which the wool was laid, and thus damaged the lower tiers of bales. No damage occurred before the ship got down by the head at Para, nor after her trim was righted at Port of Spain.

The bill of lading contains numerous exceptions of liability, including "damage by stowage, leakage, &c., though caused by the negligence of the master," &c. It also provides that the contract shall be governed by the law of the flag (English); and it is admitted that by the English law such exceptions are valid. The respondent relies on these exceptions of the bill of lading, and upon the United States Harter Act (Act Feb. 13, 1893; 27 Stat. 445; 2 Supp. Rev. St. 81, § 3).

I am of opinion that the exemption from liability for damages arising through error or fault "in the management of the vessel," does not extend to a case like the present, though the question has caused me no little embarrassment. The primary cause of the damage was negligence and inattention in the loading or stowage of the cargo, either regarded as a whole, or as respects the juxtaposition of wet sugar and wool bales placed far forward. The wool should not have been stowed forward of the wet sugar unless care was taken in the other loading, and in all subsequent changes in the loading, to see that the ship should not get down by the head. There was no fault or defect in the vessel herself. She was constructed in the usual way and was sufficient. But on sailing from Para she was a little down by the head, through inattention during the changes in the loading to the effect these changes made in the trim of the ship and in the flow of the sugar drainage. She was not down by the head more than frequently happens. It in no way affected her sea-going qualities; nor did the vessel herself cause any damage to the wool. The damage was caused by the drainage of the wet sugar alone. So that no question of the unseaworthiness of the ship arises. The ship herself was as seaworthy when she left Para as when she sailed from Pernambuco. The negligence consisted in stowing the wool far forward without taking care subsequently that no changes of loading should bring the ship down by the head. I must, therefore, regard the question as solely a question of negligence in the stowage and disposition of cargo, and of damage consequent thereon, though brought about by the effect of these negligent changes in loading on the trim of the ship.

It is urged that the regulation of the trim of the ship is a part of the "management of the ship," and hence within the Harter Act. And so it doubtless is, wherever the regulation of the trim is designedly done and done primarily with reference to the ship, and for the benefit of the ship, or with a view to her sea-going qualities. Here nothing of that kind was contemplated. The change of trim was merely incidental—the mere negligent result of the changes in the loading, no attention being given to the effect on the ship's trim, or on the sugar drainage. The handling of the ship's appliances with reference to the navigation, or the safety of the ship, for the purposes of the voyage, belong to "the management of the ship." Thus in The Silvia, 64 Fed. 607, where the officers had neglected to close the iron shutter of a port hole, in consequence of which in rough weather sea-water came in and damaged the cargo, it was held by this Court that the neglect arose in the "management of the vessel," and was covered by the Harter Act, even though from the inaccessibility of the open port as considered by this court, the open port amounted to unseaworthiness; because the neglect consisted in not making use of the things supplied by the owner to put and keep the ship herself in a proper condition to meet stormy weather. The result was affirmed in the Court of Appeals (15 C. C. A. 362, 68 Fed. 230) though the port was deemed easily enough accessible for closing to allow the ship to be called seaworthy.

So in the recent case of The Glenochil [1896], Prob. Div. 10, where at the close of the voyage, and before the cargo had been delivered, it was found necessary to fill the ballast tanks with water in order to stiffen the ship; but on the voyage the sounding pipe and casing had become cracked and broken, so that in filling the tanks the water escaped through the breaks and damaged the cargo; the failure to examine the pipes before turning on the water was found to be negligence, but within the Harter Act, because the negligent acts were done with the ship's appliances and for the ship's safety, and hence were a part of "the management of the ship."

"The negligence," says President Jeune, "consisted in the mismanagement of part of the appliances of the ship; a mismanagement which arose because it was intended to do something for the benefit of the ship, viz., to stiffen her,—the necessity for stiffening arising because part of the cargo had been taken out of her. It was further considered that the Harter Act is designed to "prevent exemptions in the case of direct want of care in respect to the cargo, and to permit exemption in respect to the faults primarily connected with the navigation or with the management of the vessel, and not with the cargo."

In the same case, Sir Gorrell Barnes observes that it was a fault in the management of the vessel in doing something necessary for the safety of the ship herself; that in the first and third sections of the Harter Act "there will be found a strong and marked contrast in the provisions which deal with the care of the cargo, and those which deal with the management of the ship herself; and that where the act done is done for the safety of the ship herself, and not primarily

done at all in connection with the cargo, that must be a matter which falls within the words "management of said vessel."

On the other hand, in the case of The Ferro [1893] Prob. Div. 38, where the bill of lading contained an exemption from responsibility from damage for any act, &c., "in the navigation or management of the ship," it was held that the improper stowage of oranges by which they suffered damage, was not covered by the term "management of the ship."

A further reason for excluding the present case from the exemption of the third section of the Harter Act, is found in the express prohibitions of the first section against the insertion of any stipulations in the bill of lading for relieving the vessel or owner from "loss or damage arising from negligence, or failure in proper loading or stowage of all lawful merchandise committed to their charge." The evident intent is that ship and owner must answer for such damages. The general words of the third section, "management of the vessel," cannot receive a construction which would contradict the evident and particular intent of the first section. The different parts of the same act must be construed harmoniously, so far as possible. The scope of a general phrase must be restricted so as not to contradict the more particular provisions of other parts of the same act. And so here, since this damage arose through negligence in the particular mode of stowing and changing the loading of cargo, as the primary cause, though that cause became operative through its effect on the trim of the ship, this negligence in loading falls within the first section. The ship and owner must therefore answer for this damage, and the third section is inapplicable.

2. It is contended, however, that if the negligence be treated as one of loading and stowage, the express exemptions of the bill of lading apply, and exempt the ship under the stipulation that the English law shall govern, since the English law upholds such exemptions.

In the case of Baetjer v. La Compagnie Generale Transatlantique, 59 Fed. 789, it was considered that such stipulations should be upheld when made within a foreign jurisdiction that sustains them, and when the damage and the cause of action arose within that foreign jurisdiction. In The Trinacria, 42 Fed. 863, however, it was said to be a "wholly different question whether the courts of this country should sustain contracts or stipulations as regards acts performed and designed to be performed either on the high seas or within the exclusive jurisdiction of this country, when such stipulations are by our law void on the ground of public policy." In the present case the contract was not made, nor was any part of it intended to be performed, within British jurisdiction. In the absence of any proof of the law either at the port of shipment or at Para, where this negligence occurred, there is no presumption that the law of either place differs from our own. The damage arose upon the high seas. Foreign law is administered only upon principles of comity. This cannot be allowed to subvert in our courts our own positive law, founded upon public policy, as respects contracts to be performed in part within our jurisdiction and in part upon the high seas.

In this respect the present case is precisely like that of Lewisohn

v. Steamship Co., 56 Fed. 602, where similar stipulations were held invalid. In the case of The Silvia, 15 C. C. A. 362, 68 Fed. 230, 231, it is said by the Court of Appeals that the carriers' "responsibility to the cargo owner, who sues in the courts of this country, cannot be curtailed in any of the particulars prohibited by the Harter act." In the case of The Glenmavis, 69 Fed. 472, 476, the same conclusion was reached by Judge Butler on full consideration; and I have nothing further to add to what has already been said in this Court in previous cases. The Brantford City, 29 Fed. 373, 396; The Hugo, 57 Fed. 403–411; The Etona, 64 Fed. 880; The Guildhall, 58 Fed. 796; The Energia, 56 Fed. 124, 127, affirmed 13 C. C. A. 653, 66 Fed. 604. See The Iowa, 50 Fed. 561.

Decree for the libellant, with reference to compute the damages.