## THE FROSTBURG.

### MERCHANTS' & MINERS' TRANSP. CO. v. CONSOLIDATION COAL CO. OF MARYLAND.

*(District Court, D. Maryland. July 21, 1885.)*

1. COLLISION—INTERCHANGE OF SIGNALS.

In the case of a collision between two steamers in the Brewerton channel of the Patapsco river, the rule is to be strictly enforced that the steamer which undertakes to reverse the statutory rule and pass starboard to starboard, assumes the risk of any misunderstanding of signals properly given by the other steamer.

2. SAME—CONFLICTING EVIDENCE.

Where the testimony is conflicting, the court will give weight to the fact that the master of one of the colliding steamers, in statements made immediately afterwards, and in his official report deliberately made some weeks later, did not attribute the collision to any fault of the other steamer alleged in the libel.

3. SAME—BEACHING OF VESSEL—LOSS.

The rule applied to the facts of this case that where the master was proved to have been reputed capable and experienced, and after the collision acted upon the best judgment he could form in the emergency with regard to getting his sinking vessel into shoal water, the owners were not to bear any portion of the loss, although the fact may have been that the master was mistaken in his judgment, and that a different course might have resulted in less damage.

In Admiralty.

*John H. Thomas*, for libelant.

*William F. Frick*, for respondent.

MORRIS, J. These cross-libels grow out of a collision in the Brewerton channel of the Patapsco river off North Point, about 8 o'clock on the morning of the seventeenth March, 1885, between the steamship Berkshire, which was coming up the channel towards Baltimore at about 10½ knots an hour, and the steamer Frostburg, which was going down the channel at about 7 knots an hour heavily laden with coal. The weather was clear, with a strong wind from the north and west, and the steamers had observed each other at a distance of several miles. They came into collision just outside the northern edge of the channel, between buoys Nos. 12 and 14; the Berkshire receiving a blow on her port side about amid-ships, from which she sank in a short time, and the Frostburg having her bow badly stove in. When the Berkshire had just entered into the Brewerton channel, and was about passing buoy No. 10, and when the vessels were a little over a mile distant from each other, there was an interchange of signals. The Berkshire gave a signal of one whistle, which was not heard on board the Frostburg on account of the force of the wind, but the escape of steam, indicating that a signal had been given, was observed. There was some difference among those in the pilot-house of the Frostburg as to whether the Berkshire had blown a signal of one whistle or two whistles. I think it is quite obvious that Capt. Le Tourneau, who was in command of the Frostburg, desired to take the northerly side of the channel if he could get it. At any rate, notwithstanding the others were in doubt about the Berkshire's signal, he responded by a signal of two blasts of the Frostburg's whistle, and put his helm to starboard.

The statutory rule prescribed for the conduct of steam-ships in the situation in which these two then were, requires each to put her helm to port, and it is settled that a steamer which seeks to justify by an interchange of signals a departure from this rule cannot justify herself if she has failed to understand a signal properly given by the other steamer. The departure from the statutory rule puts on the steamer attempting to justify it the burden of establishing on the part of the other steamer an actual proposition or assent by proper signals to the departure. *The Milwaukee*, Brown, Adm. 313; *The Mary Shaw*, 6 Fed. Rep. 923. Any mistake with regard to the signals, no matter how honestly made, is primarily visited upon the steamer which departs from the rule. In this case, in answer to a theory advanced by the owners of the Frostburg, it has been suggested by counsel for the Berkshire that even if the second signal given by the Berkshire was not promptly given after the pilot of that steamer heard the signal of two whistles given by the Frostburg, that as the Frostburg had no right to dictate to him that he should put his helm to starboard when he had already signified his intention to obey the statutory rule, he had a right to disregard the signal of two whistles

given by the Frostburg, and proceed at his usual speed without giving any answer to it. But this is not so. The moment the Frostburg answered the Berkshire's port signal with a starboard signal, there was obvious risk of collision. There was an imperative duty on the pilot of the Berkshire to respond promptly, and unless there was at once a further interchange of signals, and unless by the time the vessels had approached within half a mile of each other there was, by a proper interchange of signals, a perfect understanding as to how the vessels were to pass each other, the Berkshire would be in fault if she did not, in obedience to the twenty-first statutory rule and the third pilot rule, slacken her speed, and, if it became necessary, stop and reverse. The proof, however, is that the officer in charge of the Berkshire, after he heard the signal of two whistles from the Frostburg, did give another signal of one whistle, to which the Frostburg responded with one whistle, evidencing an agreement to pass each other port to port, in obedience to the statutory rule.

The contention on the part of the Berkshire is that this second interchange of signals took place when the vessels were three-quarters of a mile apart, and the contention on the part of the Frostburg is that it did not take place until the vessels had approached to within about a quarter of a mile of each other. This is the only question of any difficulty in the case, and with regard to it the witnesses are in direct and irreconcilable conflict. Small, the first officer of the Berkshire, who was at the time in charge of her navigation, testifies that, when abreast of the first buoy in the Brewerton channel, (buoy No. 10,) he blew his first signal of one whistle, and received two whistles in return; and he says, "I *immediately* blew one whistle again, and received one whistle from the Frostburg, and she changed her course to go towards the south side of the channel, and I put my wheel a little to port." He testifies that the Frostburg then went over to the south side of the channel, straightened down, and the two vessels so continued as if about to pass all clear, until, when they were from one-fourth to one-eighth of a mile apart, the Frostburg took a sudden sheer to the north side of the channel; that he then again blew one whistle, put his helm hard a-port, and reversed his engines full speed astern, but was struck by the Frostburg about amid-ships on his port side. The testimony of Capt. Le Tourneau, who was in charge of the Frostburg, is that, when he gave the signal of two whistles in answer to the Berkshire's first signal, he put his helm to starboard, and steadied down on the north side of the channel until the vessels were about one-quarter of a mile apart, and that up to that time he continued to think the Berkshire intended to pass him on his starboard side, and on the south side of the channel. His statement is that when about a quarter of a mile distant the Berkshire gave a signal of one whistle, and he responded with one whistle, and observed the Berkshire heading more to the north side of the channel; that he put his helm to port, and could see directly that there was going to

be a collision, and rang to reverse his engines full speed astern; that the Frostburg answered her port helm but very little, and the reversing of the propeller had a tendency to throw her head still more to port; that at the time of the collision the Frostburg had lost her headway.

In considering all the testimony bearing on this irreconcilable conflict, it is to be borne in mind that the accepted rule is that all testimony from recollection with regard to time and distances in collision cases is at best but conjecture, and usually entitled to but slight weight, unless supported by corroborating circumstances. We have, in support of the inherent probability of Small's testimony, the fact that he had shown himself careful in obeying the rule with regard to signals, by giving to the Frostburg at the distance of at least a mile the proper signal, and he did this at the earliest moment after he entered the channel. He then shaped his course to take the northerly side of the channel. Under the circumstances it would have been negligence in the highest degree—reckless—to have failed promptly to reply to the contrary signal from the Frostburg. He was in a situation far more dangerous than if he had neglected to give any signal at all, and had formed no purpose of taking either side of the channel. He had already shown himself a cautious man, and is proved to have been an experienced man, and it is hard to believe that he at once abandoned all that his experience in the management of steam-vessels and his constant experience in this particular channel must have taught him was necessary for safety. His statements are supported directly by the testimony of Capt. March, and of Hatch, the second officer of the Berkshire. Shea, the quartermaster, who was at the wheel in the pilot-house with him, did not take notice of the whistles, but corroborates Small very distinctly as to the steering and the course of the Berkshire. Small, from the first, never denied that he perfectly understood that the first signal from the Frostburg was a signal of two whistles, and it is most difficult to believe that he would have failed to repeat his signal, or to do anything, until the vessels were within a quarter of a mile of each other, each pursuing a course which he knew must result in danger. His statements are also supported by the testimony of a disinterested witness, Capt. Griggs, of the tug Tigress, who was observing the vessels from about a mile distant from the point of collision.

To show that the second interchange of signals took place at a distance of not greater than a quarter of a mile, a very strong argument has been presented by the able and learned counsel for the Frostburg, based on the testimony given in court by Capt. Le Tourneau, and other witnesses who were on board the Frostburg, and if I could accept that testimony the argument would be convincing. But as this testimony as to distance is based largely on conjecture, and is a matter in which so slight a variation in distance results in such a vital difference to the litigants, the statements of the witnesses must

be weighed with great care, and compared with statements made by them when the importance of this fact may not have been so plainly seen. There were four persons in the pilot-house of the Frostburg, viz., Capt. Le Tourneau, Bowling, the first mate, a quartermaster who has disappeared, and a Mr. Lapsley, a passenger. Bowling testifies with reserve and hesitation. He says he expressed no opinion when the character of the Berkshire's first signal was inquired about by Capt. Le Tourneau, and he alleges that he could not see the Berkshire when she blew the second signal because of the other persons in the pilot-house obstructing his view, and that he did not see her until she was close across the Frostburg's bows. He says, however, that for *three* minutes before the collision the Frostburg's helm had been hard a-port; that the Frostburg started very slowly to answer the port helm, and that after her engines were reversed she paid no attention to her helm, but fell off more to port. Lapsley, it is true, testifies that the vessels were a quarter of a mile apart when the second exchange of signals took place; but he testifies also that it was four minutes between that interchange and the collision. The earlier statements of Capt. Le Tourneau give no hint that the collision was attributable to any fault on the part of the Berkshire. The statement he made a few hours after the collision was that he could not say that the *Berkshire* was to blame; that his own vessel was unmanageable and would not steer. And in the deliberate official report made by him some weeks later he stated that the cause of the casualty was "*unaccountable.*"

Now Capt. Le Tourneau had been a sea-captain for a great many years, and is a man of good education and intelligence. If the collision was brought about, as it is now attempted to persuade the court, from the Berkshire approaching so near to the Frostburg before repeating her signal that a collision was then unavoidable, is it not highly probable that this justification would at once have suggested itself to a man of Capt. Le Tourneau's experience and intelligence? If it had been the fact, as his theory now is, that when he heard the signal of one whistle the collision was so imminent that he immediately reversed his engines at full speed, is it credible that it would not have occurred to him that the other vessel was in fault, and that he was not to blame? And, moreover, if it be supposed that Small could have recklessly brought the vessels into this situation without giving any warning, when Capt. Le Tourneau did get Small's second whistle, seeing, as he now says he did, the imminent danger that threatened, and knowing how badly his own vessel steered, is it not highly probable that, instead of answering with one whistle and consenting to attempt what he saw was so dangerous, he would have blown danger signals, or repeated his starboard signals?

It seems to me that the fact that he promptly assented to the port signal, and attempted to act in obedience to it, is significant proof that at that time he did not think the vessels were as dangerously

near to each other as he does now.   Moreover, with regard to the
Frostburg, the facts proved with respect to her navigation from the
time she left Baltimore on that morning until the collision, show
conclusively that it was fraught with danger to run her in that chan-
nel at seven knots an hour.   Her sheering from side to side was no-
ticed and commented on by every one who noticed her on her way
down from the harbor.   Her wheel worked so stiffly that those who
had her in charge were unable to keep her steadied on any proper
course; and it is proved that she actually came into contact with the
two vessels which she overtook and passed in the channel just pre-
vious to this collision.   It is proved that from the moment she
started on her voyage there was great difficulty in the management
of her steering apparatus,—at all events, in the hands of those who,
on that morning, had just taken charge of her, and were all without
any experience of the peculiar.difficulties in steering her,—and I think
it plainly appears that, when all the incidents leading to the disaster
were perfectly fresh in his mind, it was solely to that unmanageable-
ness that Capt. Le Tourneau attributed the collision, and not at all to
any delay on the part of the Berkshire in giving him the proper pass-
ing signals.   At the joint rate of speed at which the vessels were ap-
proaching each they would pass over a half mile in one minute and
three-quarters, and making all reasonable allowance for loss of speed
resulting from reversing both engines, the time stated by all the wit-
nesses to have elapsed between the exchange of signals is quite suffi-
cient to lead to 'the conclusion that those witnesses are correct who
state that the vessels were as much as half a mile apart when the
Berkshire blew her second signal.   It is true that strong testimony
against this theory is to be found in the evidence given by the wit-
ness Lee, but, as against the weight of other testimony and circum-
stances, I incline to think that he must have confused some of the
signals, and perhaps heard the third signal which Small states that
he gave.

A careful consideration of all the evidence has brought me to the
opinion that this collision was occasioned in the first place by Capt.
Le Tourneau taking the first signal of the Berkshire for a signal of
two whistles, and, although there was some doubt about it, immedi-
ately putting his helm to starboard; and in the second place, and
proximately, notwithstanding the Berkshire gave a second signal of
one whistle promptly, and at a sufficient distance to have enabled
both steamers, if properly steered, to have passed in safety, because
the Frostburg at that moment refused to obey her helm, and con-
tinued to advance towards the north side of the channel, and because
the reversal of her propeller threw her head still more to the north
side of the channel, and rendered it impossible for the Berkshire to
clear her, although the Berkshire, in the attempt, had run quite out-
side of the buoys on the north side of the channel before the collision
took place.

With regard to the subsequent maneuvers of the Berkshire in attempting to get her into shoal water, I see no reason to doubt that her captain acted in the emergency with the best judgment he had an opportunity of forming, and as he is an experienced and competent commander, the libelants are not responsible for any mistake of judgment on his part after the disaster occurred, unless it was so plainly wrong that it would have been rejected by any skillful and competent navigator placed in like circumstances. This has not been shown. In my judgment the Frostburg was solely to blame for this collision.