## THE NEWPORT NEWS.

(Circuit Court of Appeals, Fourth Circuit. November 21, 1900.)

### No. 363.

1. ADMIRALTY—APPEAL—REVIEW OF QUESTIONS OF FACT.

Where a cause in admiralty is reviewed on appeal on the same pleadings and proofs the decision of the trial court on issues of fact will not be reversed, except for clear error, especially where the witnesses were examined in the presence of the judge.

2. COLLISION—STEAM VESSELS—SPEED IN FOG.

A steamer navigating in a fog is bound to proceed only at a speed which will enable her to come to a standstill by stopping and reversing within the distance necessary to avoid collision after a vessel approaching from another direction can be seen.

3. SAME—STEAM VESSELS MEETING—KEEPING TO WRONG SIDE OF CHANNEL.

A collision between a steam ferryboat running between Washington and Alexandria, on the Potomac, and a steamer coming up the river to Washington, during a fog, held to have been caused by the fault of the ferryboat in keeping to the Maryland (left) side of the channel, and in changing her course to port after hearing the signal of the approaching vessel.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Alexandria.

In Admiralty. Suit for collision, heard and determined in the district court by Waddill, District Judge.

Libelant appeals from a decree dismissing its libel rendered by the district court for the Eastern district of Virginia. The questions are chiefly of fact, and the case comes before this court on the same pleadings and proofs as were before the district court. The collision which was the subject of the libel occurred in a fog on the Potomac river on the morning of September 6, 1897, between appellant's side-wheel ferryboat Columbia, plying between Washington and Alexandria, and the appellee's screw steamer Newport News, that

plies between Norfolk and Washington. The Columbia is of iron and wood, and measures 155 feet by 52 feet beam. The Newport News is of steel, 260 feet long on keel, and 275 feet over all, 46 feet beam, and 14 feet depth of hold, with a draught of 10 feet forward and 13 feet aft. The libel alleged a custom in fog to take the Maryland (left) side of the channel going down, which the answer denies. The story of the Columbia is: "On arriving at a point about opposite the United States magazine a fog signal was heard from a steamer below, whereupon the engines of the Columbia were immediately slowed down to a speed barely sufficient for steerageway, and she had been slowed down in this way for three or four minutes when a signal of three blasts of a steam whistle was heard from a steamer apparently about three points off the starboard bow, which signal was immediately answered by three blasts of the Columbia's whistle, and her engines were immediately stopped; the vessel's course being then changed from S. by W. to S. In this manner she drifted with the tide, her headway through the water being stopped for a period of one or two minutes, when a steamer, which afterwards proved to be the Newport News, suddenly appeared through the fog, apparently from 100 to 125 feet off, and from two to three points on the starboard bow, coming at a high rate of speed towards the Columbia, and almost immediately thereafter came into collision with her, striking her guard forward of the wheel, cutting through the guard, breaking the wheel shaft and starboard wheel, tearing off one leg of the gallows frame, and doing other damage. The collision occurred about one hundred yards above Sheppard's wharf, and close to the eastern bank of the channel." The faults charged are unlawful speed; not properly sounding fog signals as required by law; not having efficient lookout; not starboarding in time; not stopping and reversing in time to prevent collision. The Newport News alleges: "Just before reaching a point opposite Sheppard's wharf in the course to Washington, and about five minutes' run from Alexandria, the Newport News ran into a fog bank. She was immediately slowed down, and fog whistles blown at intervals, as required by law. Shortly after this those in charge of the steamer Newport News heard one whistle of a steamer, which could not be accurately located. Immediately the engines of the Newport News were stopped, and three blasts of her steam whistle given. The steamer having then drifted a few minutes, those in charge of her heard a second whistle. It then appeared to be quite near and on her port bow. Immediately the signal was given, and the engines of the Newport News put full speed astern. She had been backing a short time, possibly a minute and a half, when those in charge of her saw the steamer Columbia crossing the bows of the Newport News from the Virginia shore eastwardly towards the Maryland shore. Almost immediately after she came in sight of the Newport News the collision occurred; the steamer Columbia striking the stem of the Newport News with her starboard side, and at a point a few feet forward of the starboard wheel of the Columbia. The steamer Newport News was at the moment backing astern, and had actually gained sternway, whereas the steamer Columbia was under decided headway,—so much so as to drive, push, and carry the bow of the Newport News to starboard." The time of the collision is placed as about 6:41; the place, about a mile from Alexandria. The faults charged: Not slowing down on hearing fog signal of respondent; not stopping and reversing on hearing the three blasts; not keeping to the Virginia (right) side of the channel; in changing course and trying to cross the channel when a steamer was approaching whose location had not been fixed, and for immoderate speed both before and after this change of course; not stopping and reversing her engine; not having proper lookout properly stationed; no competent master or mate; not sufficient crew. The district court dismissed the libel, with costs.

Libelant assigns the following errors: First, the court erred in dismissing the libel with costs; second, the court erred in holding that the respondent was free from negligence in the premises; third, the court erred in not giving a decree in favor of the libelant on the facts as shown; fourth, the court erred in holding the libelant in fault for taking the eastern side of the channel; fifth, the court erred in holding libelant in fault for changing its course; sixth, the court erred in holding libelant in fault for immoderate speed; seventh,

the court erred in holding that it was a case of crossing; eighth, the court erred in holding that the libelant was in fault for not stopping and reversing; ninth, the court erred in holding that the Newport News was on its proper course and about in its proper place, and that it did all that could be reasonably required to avert the collision; tenth, the court erred in holding that the Newport News was not proceeding at an undue rate of speed, and that it exercised due care on its part to avoid the collision.

Jas. R. Caton and Robert M. Hughes, for appellant.

Wm. H. White and Harrington Putman, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and PURNELL, District Judge.

PURNELL, District Judge (after stating the facts). The appeal, then, is on findings of fact, and is one of those cases in which it is uniformly held, "Where the issues of fact are decided against an appellant and the cause is reviewed upon the same pleadings and proofs, this court will not reverse unless on clear error." All the witnesses, with one exception, were examined in the presence of the district judge. The exception was the quartermaster of the steamship Newport News, whose deposition before the local inspectors of steam vessels was introduced in evidence by consent. It has been long settled in admiralty appeals that the decision of the trial judge, who had an opportunity to see the witnesses, will not be readily reversed on questions of fact by the appellate court. "To warrant a reversal upon a mere question of fact, the preponderance of the evidence should be of a somewhat decided character,— such as would justify the granting of a new trial in a court of common law on the ground that the verdict was against the weight of the evidence. It seems to me that this principle should govern this court in reviewing a question of fact determined by the district judge." The Grafton, 1 Blatchf. 173, Fed. Cas. No. 5,655, Nelson, J. (1846). This court has announced this rule in a recent case,—The E. Luckenback, 35 C. C. A. 628, 93 Fed. 841. There was the usual conflict of testimony in such cases, each witness swearing for his own boat or the ship with which he was identified,—a disposition not always confined to seamen, but to passengers, and others temporarily or remotely connected therewith. The trial judge, noting the conduct of such witnesses, their deportment on the stand, and the manner in which they gave in their testimony, can better reconcile conflicts and contradictions than any one who reads over conflicting testimony, "mere words," without opportunity to do either. The record in this case is voluminous,—250 pages of printed matter,— and after a careful examination of this, and the briefs filed, after oral argument, there does not appear any reversible error. The district judge exercised great care in finding the facts, and prepared an opinion which commends itself so strongly as being eminently correct that we adopt, therefore, the following as the opinion of this court:

"The statement of the contentions of the parties, respectively, and the faults charged by the one against the other, will at a glance show how utterly at

variance they. are as to how the collision happened, and who is responsible therefor. Each charges the other with at least half a dozen faults, any one of which, if proven, would be sufficient to fix the responsibility for the collision, and, as is usual in such cases, each side has witnesses to support its respective contention; and these witnesses are not limited exclusively to the officers and crews of the respective steamers, as frequently happens. The faults charged by the libelant against the Newport News are unlawful speed; not properly sounding fog signals as required by law; not having an efficient outlook; not starboarding in time; and not stopping or reversing in time to prevent the collision. The faults charged against the Columbia are not slowing down on hearing the fog signals of the Newport News; not stopping or reversing on hearing her three blasts; not keeping to the Virginia (right) side of the channel; changing her course and trying to cross the channel when a steamer was approaching whose location had not been fixed; for immoderate speed both before and after this change of course; not stopping or reversing her engines; not having proper lookout properly stationed; and that said steamer was being navigated by an incompetent master and mate and an insufficient crew. I shall not attempt to determine all the questions of negligence raised between the parties, or, indeed, to settle all of the many conflicts in the evidence between the witnesses, as much of the conflict is upon immaterial matters, or points unnecessary to be passed upon in the view I take of the case. My effort will rather be to arrive at a correct conclusion upon one or two of the more important issues, which, if determined, will dispose of the case.

"The libelant seeks to establish a custom, in case of a fog, for steamers to take the Maryland (or left) side of the channel in going from Washington to Alexandria, and in this way to account for the position of the Columbia on the eastern instead of the western side of the channel at the time of the collision. That such custom, if it exists, may serve to supersede the usual rules of navigation, may be conceded. The Pavonia (C. C.) 26 Fed. 109; The James Bowen (D. C.) 52 Fed. 510. This being the effect of a local custom, there should be no doubt of its actual existence, known generally to persons engaged in the business to be affected, and the proof of it should be clear and conclusive. The evidence in this case satisfies me that there was no such custom as that contended for by libelant, and, moreover, that there was not the slightest reason for its existence. An inspection of the chart shows a straight reach between those points, particularly from the forks of the Georgetown channel, below the arsenal at Washington, down to Alexandria, a distance of four miles; the Virginia (or right) side of the channel being marked by black buoys. There is no suggestion of cross currents, and the chart shows no obstruction in the channel proper, which is from three to four hundred yards wide, and, as testified to by the libelant's witnesses, is about half a mile wide between Sheppard's and Alexandria. It is true, libelant introduced quite a number of witnesses who testified as to this custom. They were mostly, however, persons in the employment either of the libelant or the superintendent of libelant's company; and I do not think their evidence is sufficient to establish a general custom, which would have been so well known had it existed, particularly when the fact is vigorously controverted by the respondent's witnesses. Indeed, the libelant's evidence on this question is not of the clear and convincing character it should be. The master of the companion ferryboat owned by the libelant virtually repudiated the existence of such a custom, as did also the former master of the Columbia; and Folkes, the master in collision, on cross-examination, in effect, conceded it did not exist. He testified as follows: 'As a matter of fact, is not your course from the time you leave the arsenal south by west? A. Yes, sir; I do. Q. Then from the time you leave the arsenal, heading for Alexandria, your course is a straight course? A. Yes, sir; south by west. Q. And that straight course you can pursue on either side of the channel or in the middle of the channel? A. No, sir; if you keep on the straight course you can't. Q. And you would almost run into your slip by taking the midway channel in running from Washington to Alexandria? A. Yes, sir; if you know when you get there. Q. In clear weather your course is south by west? A. No, sir; we run down to Sheppard's. Q. In clear and foggy weather?

A. Yes, sir. Q. And there is no difference in your course in clear and foggy weather? A. No, sir; we run down to Sheppard's. Q. Now, then, starting from your slip in Washington, you can see in clear weather your slip in Alexandria, can't you? No, sir. Q. Simply because of the distance, and not because of any— A. No, sir. Q. You cannot see until the time you get to the arsenal? A. Yes, sir; after you get below the arsenal, at the forks of the channel. Q. And then it is a straight course? A. Yes, sir; from the forks of the Georgetown channel. Q. And you run the same course in all weather? A. No, sir; we do not run the same course in all weather. Q. You just said you did. A. Well, that is all right. I did not say we run the same course in all weather. We run wherever we can get down on either side. Q. Well— A. Supposed to run one side as much as the other. Q. Well, have it so. Then you have no regular side, but run one side as much as the other? A. Yes, sir.' James N. Marmaduke, master of the steamer Bellehaven, companion ferryboat to the Columbia, testifies as follows: 'By the Court: Along which side of the river, according to the custom, do steamers travel in going from Alexandria to Washington in case of fog? A. Well, some runs one way, and some another. Some boats that leave there and runs pretty well out from the wharf before they straighten up, and I suppose they aim to run about the middle of the channel, and some run a little nearer. I have met as many on one bow as the other. Q. Then you mean that there is not any custom as to which side the steamers take in going up, and there is a custom in coming down? A. I don't think there is any custom. If a man gets abreast of the ferry, and can get a better course before you get to the Gessboro wharf— You can get a better departure after leaving Alexandria than at Sheppard's, because the bank runs out from Sheppard's, because your boat will smell the mud and run off from it.' Other witnesses for the libelant, by whom it was sought to prove the custom, substantially disprove it on cross-examination; and, indeed, taking the evidence as a whole, there is, to my mind, no real foundation to support the claim. The contention that there was any obstruction in the channel to make such a custom utterly failed. Indeed, the master of the Columbia, in his examination before the inspectors, admitted that there was none. The government chart, as above stated, shows no obstruction, and the effort to prove that there was any real interruption in the navigation of the river at the mouth of the old Alexandria canal, on approaching Alexandria, entirely broke down.

"The respondent further contends that the Columbia, in addition to being on the Maryland (left) side of the channel, improperly changed her course, and in that way increased the chances of collision. The master of the Columbia must have known of the cardinal rule of navigation in rivers and narrow channels,—to keep to the right. The most ignorant navigator will be presumed to have known of this simple and wise requirement. It was long ago settled, before the adoption of formal rules and regulations on the subject, that steamers meeting in narrow channels should port their helms, and thus pass each other. New York & B. Transp. Co. v. Philadelphia & Savannah Steam-Nav. Co., 22 How. 461, 16 L. Ed. 397; The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; The America, 2 Ben. 475, Fed. Cas. No. 280; The Yourri, 10 App. Cas. 276 (Privy Council, 1885); The Energia (D. C.) 56 Fed. 124; Id., 13 C. C. A. 653, 66 Fed. 604; Occidental & O. S. S. Co. v. Smith, 20 C. C. A. 419, 74 Fed. 261.

"The question of whether the Columbia improperly changed her course at the time of the collision can only be determined from a consideration of all of the facts, and in that connection should be considered the conduct of the two steamers at the time of the collision, and whether either one, and, if so, which, brought about the collision. On the one hand it is insisted that the Columbia changed her course and crossed the channel with a steamer approaching whose location had not been fixed, and that she failed to stop and reverse on hearing the proper signals from the Newport News, but proceeded at an immoderate rate of speed. On the other hand, it is contended that the Newport News likewise failed to stop and reverse in time to prevent the collision, and proceeded at an unlawful rate of speed, without giving proper signals or making the proper maneuvers by starboarding her helm. That the Columbia

did starboard and change her course from south by west to south, so as to proceed further to the eastern or Maryland side of the channel, seems to be quite clear from the evidence; that is, from the libelant's own evidence. The libel alleges that when opposite the United States magazine, on hearing the fog signal from a steamer below, the engines of the Columbia were slowed down to speed barely sufficient for steerageway, and, after so remaining for three or four minutes, on hearing the signal of three blasts from a steamer about three points off her starboard bow the engines were immediately stopped and the course of the vessel changed from south by west to south, in which manner she drifted with the tide for one or two minutes, when the Newport News suddenly appeared through the fog, apparently one hundred to one hundred and twenty-five feet off, when the collision occurred. The master of the Columbia, in his examination before the inspectors, testified that he starboarded at the time of the collision, and that his course was south, though on the trial he stated it was south one-half west. The mate of the Columbia also testified before the inspectors that the captain told him he was going to the eastward, though on the trial he says the course was south one-half west and before the inspectors he likewise testified that the Columbia was hard a-starboard, but he denied this on the trial. The mate further testified before the inspectors that the captain said on hearing the whistle of the steamer below, which appeared to be on their starboard bow, that he was going to let her (referring to the Columbia) go to the eastward and keep out of the way of the Norfolk steamer, and that they so went along until he espied the Newport News, when she blew three whistles, to which the Columbia replied. The evidence of the master of the Columbia before the inspectors is clearly that he changed his course from south by west to south, and in his examination before the court it seems equally certain that he was attempting to avoid the effect of the statement thus made. He explained before the inspectors why he starboarded and changed his course from south by west to south, viz. on account of hearing the whistle of the Newport News on his starboard; and he further admitted at the trial, on cross-examination, in answer to a question by the court, that on the course south·by west he would have met the Newport News about the middle of the channel, but as a matter of fact he did meet her on the eastern side of the channel. The evidence before the inspectors was taken a short time after the accident, when the facts were all fresh in the minds of the witnesses, and the inspectors were persons peculiarly fitted to make the investigation of the character under consideration; and that they suspended the master of the Columbia for changing his course, according to his own admissions, is not surprising. The New York (D. C.) 53 Fed. 556. The effect of this change in the Columbia's course was to place her across the bows of the Newport News, which is the position in which respondent's witnesses say she was when first discovered by the navigators of the Newport News, and at a time when it was too late to avert the collision. The·fact that a fog existed at the time of the collision made it even more imperative that the Columbia should not have changed her course. In The Vanderbilt, 6 Wall. 225, 18 L. Ed. 823, Mr. Justice Clifford, speaking for the court (page 229, 6 Wall., and page 824, 18 L. Ed.) said: 'Steamers may doubtless ascend on either side of the river in the daytime, when the view is not obstructed or obscured by fog; but it was a fault in the steamer, when she found she was approaching a fog bank, that she did not port her helm and leave the accustomed passway of descending boats and vessels.' 'Steamers approaching each other from opposite directions are required by the general rules of navigation, as well as by the recent act of congress, to port their helms and pass to the right; but it is obvious that one or both may omit to comply with the requirement until their proximity is so close that a compliance is wholly inadequate to accomplish any valuable purpose' (page 230, 6 Wall., and page 824, 18 L. Ed.). Mar. Mar. Col. 381, 502; The Servia, 149 U. S. 153, 13 Sup. Ct. 817, 37 L. Ed. 681.

"The Columbia, being in a fog, on hearing the signals of the Newport News on her starboard bow should not have speculated on the possibility of the vessels passing clear. If they were not meeting, they were crossing. If meeting, the Columbia should have ported her helm and passed to the right.

If not meeting, they were necessarily crossing, so that the Columbia had the duty of avoidance. And in neither case was she right in starboarding her helm. The Phenix and The Atlanta, 20 U. S. App. 129, 7 C. C. A. 572, 58 Fed. 927. This was a similar collision on the Hudson river, in which the court said: 'It is, however, conceded that when the fog signals of the Atlanta were first heard by the Phenix the former was on the latter's starboard side. The duty of avoidance, therefore, was plainly on the latter. We are satisfied from the proof that the fog was so dense that neither vessel could see the other at a greater distance than four hundred feet.' The Frostburg (D. C.) 25 Fed. 451.

"The respondent insists that the Columbia should have stopped and reversed her engines upon hearing the three whistles of the Newport News, which the Columbia claims was not necessary, and that she did all that was required, viz. to come to a standstill and kill her headway. This brings us to the consideration of the question of the speed of the respective steamers at the time of the collision, and just what each did at the time. The officers and crew of each steamer denied that their steamer was rapidly moving forward at the time of the collision. The Columbia's officers and crew testified that she had come to a standstill when the Newport News came into collision with her on the starboard side, striking her on her starboard guard, and forward of the wheel. The officers and crew of the Newport News testified that she had killed her headway, and was moving backwards, when she was collided with by the Columbia coming up on her port bow and striking the stem of the Newport News, with her starboard side at a point a few feet forward of the starboard wheel house of the Columbia. Just which of these contentions is true can only be determined from all the evidence and circumstances. The Columbia's officers, by reason of their persistent efforts to vary the statements made by them before the inspectors, do not place themselves in an enviable light before the court. Upon many of the most material questions involved in the case, their evidence before the court is entirely contradictory of that given by them before the inspectors, which disentitles it to the weight which would otherwise be given it. The Morning Light, 2 Wall. 550, 17 L. Ed. 862; The Potomac, 8 Wall. 590, 19 L. Ed. 511; The Frostburg (D. C.) 25 Fed. 451; The Mary Lord (D. C.) 26 Fed. 862, 865. The evidence seems to be quite clear, even from the libelant's own witness, that, whatever may have been the speed of the Columbia at the exact moment of the collision, she must have averaged between nine and ten miles an hour to about the time of the collision, in order to have been at the scene of the collision when it occurred. The engineer of the Columbia testified before the inspectors that it was ten miles an hour, and before the court he said about nine,—between eight and nine. Most of this distance was in a fog which the Columbia encountered about five minutes after leaving her wharf at Washington. Thus, during the greater part of the trip the Columbia was proceeding at an unsafe rate of speed. The rule, as laid down in this circuit, requires a steamboat to so proceed as to be able to bring herself to a standstill after viewing the approaching vessel in a fog. The Laurence, 8 U. S. App. 312, 4 C. C. A. 501, 54 Fed. 542. Goff, Circuit Judge, speaking for the court of appeals, said: 'She was bound to observe unusual caution, and maintain only such a rate of speed as would enable her to come to a standstill by reversing her engines at full speed before she should collide with a vessel which she could see through the fog.' And in The Raleigh (C. C.) 44 Fed. 781, 783, it is said: 'The rule is that such speed only is lawful or moderate speed in a fog as will permit a steamer seasonably and effectually to avoid a collision by slacking a speed or by stopping or reversing within a distance at which another can be seen. If this rule is a severe one, and practically requires a steamship to come to a stop and remain stopped when navigating a river having extensive commerce, or in a crowded harbor, it is too well established to be disregarded.' While it is true that two of the passengers of the Columbia testified that she was at a standstill at the time of the collision, and that the Newport News was rapidly moving and came in collision with her, still this is positively contradicted by the officers and crew of the Newport News and four passengers, whose evidence is entitled to great weight. The four passengers of the Newport News referred to were on the

bow of the steamer in the collision, and were in a position to see exactly what occurred. They were three pilots,—two Maryland and one Virginia,—and the manager of the National Hotel in the city of Washington, who for some years was engaged in the wrecking business, and therefore familiar with the navigation of steam vessels. The Favorita, 1 Ben. 30, 33, Fed. Cas. No. 4,693; The Alhambra (C. C.) 33 Fed. 78, 79. All four of these witnesses fully sustained the contention of the officers and crew of the Newport News, and testified that the Columbia suddenly emerged from the fog, moving at a rapid rate across the bow of the Newport News, and came into collision with the latter steamer, her starboard guard, forward of the wheel house, colliding with the stem of the Newport News; and they further testified that the Newport News had at the time killed her headway and was moving backward. Taking this evidence, coupled with the fact that the Columbia, up to within a short time of the collision, had been moving at an immoderate rate of speed, and the further fact that she was making a maneuver by starboarding her helm, and, as testified to by her mate before the inspectors, to get out of the way of the Newport News by going to the eastward, which, in order to be effectual, necessitated her going forward and not standing still, I am forced to the conclusion that she was a steamer in rapid motion when in collision; and the same evidence indicates that the Newport News, which at the time of the collision was on her proper course, and about where she should have been, did all that could be reasonably required of her to avert the collision under the circumstances. Certainly she had no right to anticipate that the Columbia would be found on the eastern side of the channel, moving under a starboard instead of a port helm. So far as the contention of the libelant is concerned that the Newport News entered the fog on leaving Alexandria, and not near Sheppard's, as it contended, it is immaterial, as the Columbia, when about a mile above Sheppard's, conceded that she heard the fog signals of the steamer below, and therefore had abundant warning to look out for her. The preponderance of the evidence seems clearly to indicate that the Newport News was not proceeding at the time at an undue rate of speed, and that she exercised due care on her part to avoid the collision at the time of the accident. My conclusion is that the collision was the result of the Columbia navigating on the wrong side of the channel, and while on such side improperly changing her course in front of the approaching steamer, which of itself would disentitle her to recover in this case, and that, moreover, she, and not the Newport News, as herein stated, was in fault at the time of the collision."

The decree of the district court is affirmed.