## THE CITY OF LOWELL.

(Circuit Court of Appeals, Second Circuit. March 5, 1907. On Rehearing, March 23, 1907.)

### No. 161.

1. COLLISION—NAVIGATION OF EAST RIVER IN FOG—CARE REQUIRED.

While a large steamship passing out from East river after 7 o'clock in the morning is not required to stop and anchor in the fairway because a dense fog closes in, it is her duty to navigate with great care, and not only to reduce speed, but also to keep sufficiently near the center of the river to avoid dangerous proximity to piers and ferry slips.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 184–186.

Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

2. SAME—STEAMER AND FERRYBOAT CROSSING—MUTUAL FAULT.

A large sound steamer when passing down the East river about 7 o'clock in the morning entered a dense fog when some distance above the Brooklyn Bridge, being at that time about the center of the channel. She continued at slow speed, and after passing the bridge, and when off the Wall Street ferry slip and near the ends of the piers, came into collision with a steam ferryboat crossing from Brooklyn. *Held,* that she was in fault for allowing herself to vary from the compass course which would have kept her in or near the center of the channel; that the ferryboat was also in fault for failing to stop when, being then near the center of the river, she heard the whistles of the steamer on her starboard hand, and apparently forward of her beam, but was unable to see the steamer because of the fog, since, if the starboard hand crossing rule was not applicable, the situation was governed by article 16 of the inland navigation rules (Act June 7, 1897. c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2880]), which required her under such circumstances to stop and navigate with caution until danger of collision was over.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 194, 195.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York holding the City of Lowell solely in fault for a collision with the ferryboat Columbia in the East river off the Wall Street ferry slip a little after 7 a. m. November 4, 1904, in an extremely dense fog. The ferryboat was bound across the river from Brooklyn; the steamer coming down to round the Battery for her pier in the North river. The opinion below is reported in 139 Fed. 901.

Harrington Putnam, Henry E. Mattison, and Wing, Putnam & Burlingham, for appellant.

La Roy S. Gore and James J. Macklin, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The presentation of the facts in the opinion of the district judge is most exhaustive, and need not be repeated. We concur with him in the conclusion that the Lowell was in fault. The suggestion of counsel for the appellee that a steamer 322

feet long should have anchored at 7 a. m. in a dense fog in the fairway of the East river near the Brooklyn Bridge does not commend itself. The distance was not great from the place below the Williamsburg Bridge where the fog closed in to the more open water beyond the river's mouth, and the bells on successive ferry slips were guides by which the navigators could note their progress and determine when they had reached the point where the necessary change of compass course should be made; but in thus proceeding the utmost precautions were necessary, not only to reduce speed, but also to keep sufficiently near the center of the river to avoid dangerous proximity to piers and ferry slips. A careful study of the testimony satisfies us that in the matter of speed the navigators of the Lowell were doing all they could to keep her speed down to barely steerageway while moving on to get out of that dangerous locality; but we are also forced to the conclusion that they made a serious miscalculation as to their course, which resulted in bringing her but a little ways off the Columbia's Manhattan slip. By reason of the bend in the river, it is necessary for a vessel coming down to change her compass course about the time she passes Brooklyn Bridge, and the usual course there laid by a vessel navigating in midriver is S. W. by W. ½ W.

Of the four persons in the pilot house of the Lowell, two testify that glancing aloft through the fog they saw the Brooklyn Bridge. The wheelman testifies that he did not see it, but, being told by the others that they were passing it, he changed the compass course to the one named. . Of the two witnesses who saw the bridge through the fog, one says that they passed under about the center of the span, the other "a good deal nearer to the Brooklyn tower than to the middle of the bridge." Neither of these statements can be made to harmonize with the other testimony in the case. Taking even the center of the span as a starting point, the compass course would carry the Lowell several hundred feet clear of the Wall Street ferry slip; but the testimony given by those on the ferryboat, who heard the sound of voices, hoisting engines, etc., on shore, clearly sustains the proposition that the collision took place but a short distance from the slip. Moreover, the testimony of the pilot of the Fulton ferryboat to whom the district judge refers is most persuasive, since it is conceded that the Lowell passed between her and the New York shore. His story is that he just missed making his New York slip, finding himself close up to the white spiles of the Mallory Line Pier. Thereupon he backed out, navigating from the Brooklyn end of his boat, sufficiently in his judgment to enable him to make the slip on his second attempt. But a small amount of clearance was needed, since it was the first of the ebb and the tide barely half a mile an hour. His estimate that he went back about two lengths seems altogether reasonable. There is no conceivable reason why he should have gone further. But, if the Lowell were where her two witnesses say she was, he must have backed about half way across the East river to enable the Lowell to pass him to the westward—a supposition too highly improbable to be accepted. We are entirely satisfied that, when the Lowell passed the Brooklyn Bridge, she was a considerable distance to the westward of the center of the span. And we conclude that her navigation was faulty, in that she did not lay

a course which would have brought her to the line of the bridge so near to the center of the span that the new course (S. W. by W. ¼ W.) would have brought her down substantially in midchannel, or at least so near it as not to interfere with ingress to the ferry slip. The chart shows that there is a bend in the river at Corlaer's Hook, which, of course, necessitated a change of course. This was where the fog closed in. "We ran into the fog there at Corlaer's Hook," says the wheelsman, "after we turned around under the [Williamsburg] bridge." The Lowell was at that time in the middle of the river, both shores visible, and, if a proper compass course were then laid and held to carefully, it should have brought her down midriver to the Brooklyn Bridge. The record does not disclose what compass course was laid, so we cannot tell whether a miscalculation in that respect was the cause of the subsequent trouble. The Lowell after rounding Corlaer's Hook, backed to check her headway on entering the fog and backed again to allow a Catherine Street ferryboat to pass; but she has two propellers and backs straight, not like a single-screw boat. There is some evidence from the wheelsman (the only witness to compass course) that at one time while above the Brooklyn Bridge she had lost steerageway and her head was swinging off the course, and that he brought her back by porting the wheel. We cannot say what particular act of commission or omission brought her to the lower bridge so far west of its center as the evidence shows she was, but we are satisfied that some miscalculation amounting to a fault put her so far from midriver that the new course brought her at the time of collision close to the ferry slip.

We are unable, however, to concur in the finding that the ferryboat was free from fault. According to the narrative of her master, he blew a four-whistle blast to the bellman at the New York slip when she was in midriver. Immediately after he heard three whistles (the Lowell, as the event proved) on his starboard hand well up the river. He did not stop then, but ran on until he was near his dock, when the Lowell's second three blasts were heard, and immediately thereafter the vessels came in sight of each other and into collision. Had the Columbia stopped her engines when the first whistles were heard, and not resumed navigation until the position and movements of each boat was understood by the other so that it might be conducted without danger of collision, this accident would not have happened. Upon cross-examination the master admitted that he gave attention to those first three whistles by trying "to get under the dock out of that boat's way if possible"; that he judged it was a vessel coming down; supposed it was one of the big boats; knew he had her on the starboard hand (the Columbia was heading north at the time and the other was therefore forward of her beam); and knew that it was his duty to avoid her. The district judge held that the starboard-hand rule did not apply because the Columbia was near her Manhattan slip; but her failure to stop her engines when the first signal was heard occurred when she was only a little way past midriver. The privilege accorded to ferryboats attempting to effect an entrance into their slips is not extended to cover their navigation in the main river. N. Y. & Norwalk S. Boat Co. v. The Columbia (D. C.) 92 Fed. 939. Her counsel argues that it should not apply because the vessels were unable to see each

other's location and heading. It is not necessary to express any opinion upon this proposition which seems rather broadly expressed. See The Oceanic (D. C.) 61 Fed. 338; The Newport News, 105 Fed. 389, 44 C. C. A. 541. If it be held that the starboard-hand rule is inapplicable when the position of the other vessel is not ascertained because of fog, then the situation is governed by article 16 of the Act June 7, 1897 (30 Stat. 96, c. 4 [U. S. Comp. St. 1901, p. 2880]), which provides that:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

In our opinion, when from hearing the first three whistles of the Lowell the navigator of the Columbia, while still but a little past mid-river, had good reason to suppose (as he says he did) that one of the large Sound steamers was coming down on his starboard hand and forward of his beam, it was reckless navigation to keep on across what he should have supposed might be her course, instead of at once stopping and sounding alarm signals.

The decree is reversed, with costs of this appeal, and cause remanded, with instructions to divide the damages, with interest, but without costs.

### On Rehearing.

Counsel is in error in supposing that the court was ignorant of the East river statute of 1848, since embodied in the New York City consolidation act—it has been before us many times—or that it "overlooked" the fact that the whistle blown by the Lowell near the bridge was a three-blast whistle. Although one of the witnesses testified that it was customary with steamers navigating in a fog as the Lowell was to sound such a signal, it was nevertheless a fault to do so, certainly whenever the engines were not in fact going full speed astern. But we did not discuss that fault because it was manifest from the testimony that the three-blast signal in no way misled the pilot of the ferryboat.

The petition for reargument is denied.