## THE ISABELA.

(District Court, S. D. New York. June 3, 1924.)

Collision ⬉102—Steamer and tug towing car float in collision held both at fault.

Where steamer, after having backed out of slip in North River in a fog, collided with outside car float on starboard side of tug, *held*, that steamer was at fault for not having blown fog signal after clearing the slip, as required by Inland Regulations June 7, 1897, art. 15 (Comp. St. § 7888), and that tug was at fault for sheering over from middle of river to within 300 feet of pier line, at point where river was only 1,600 feet wide, and for not hearing steamer's slip whistle, in view of Laws 1882, c. 410, § 757.

In Admiralty. Libel by the New York & Porto Rico Steamship Company, owner of the steamship Isabela, against the Director General of Railroads, operating the Delaware, Lackawanna & Western Railroad, with cross-libel. Decree for half damages and half costs.

Burlingham, Veeder, Masten & Fearey and Chauncey I. Clark, all of New York City, for libelant.

J. E. Morrissey, of New York City, for Director General.

WARD, Circuit Judge. December 9, 1919, at about 10:20 a. m. the steamer Isabela, bound to Havana, came into collision with New York, New Haven & Hartford car float No. 58, being the second and outside float on the starboard side of the tug Corning, bound to Hoboken, North River, at a point about 300 feet off Pier 13, East River, in dense fog. At the time of collision and for a little time before it the extent of visibility was not more than 200 feet, and as neither vessel saw the other until they were that near together the collision was then inevitable. The material question, therefore, is whether either was or both had been before that moment guilty of fault contributing to the collision.

The Isabela is charged with fault for starting out in the weather prevailing, and for not blowing the usual slip whistle, and for not going ahead on her engines promptly, and for not blowing proper signals. The United States Weather Bureau reports light fog, that is, fog in which objects can be seen more than 1,000 feet away, from 8 a. m. to 10 a. m. and between 10 and 11, dense fog, which means the obscuration of objects 1,000 feet away or less, continuing until 9 p. m. The scrap deck log of the Isabela, which was lying bow in on the south side of covered Pier 13, states:

"9:30 a. m. Pilot came on board.

"9:45 a. m. Tried out telegraph, steering gear, and whistle. Tugboat H. B. Rawson alongside.

"10:10. Stand by on telegraph.

"10:16. Lines let go off Pier 13.

"10:16. Half speed astern.

"10:17. Full speed astern.

"10:18.  Stop.

"10:20.  Tugboat H. B. Rawson left ship. (There is a line drawn through that.)

"10:21.  Full speed ahead.

"10:22.  Stop.

"10:22.  Coming out of slip in heavy fog. Barge No. 58 New Haven tow of Lackawanna tug Corning bumped into stern. (There is a line drawn through 'Barge No. 58 New Haven tow of Lackawanna tug Corning,' and also through 'bumped into stern.')"

All parties agree that the fog suddenly shut down very thick. The Isabela did not move until she had been advised by the Ward Line superintendent of loading at the end of the pier, by the second officer at the stern, and also by the master of the tug Rawson that it was all clear. The master, pilot, and third officer were on the bridge; the first officer at the bow, with the boatswain, carpenter, and several sailors, and the second officer at the stern with several sailors. If the visibility at the time the Isabela was half out of the slip was 1,000 feet, the Corning and her tow would not have been visible, and I find that they were not. Under these circumstances I do not think the Isabela at fault for starting out. There was no reason to expect the sudden shutting down of fog at that time. The libel states that the Corning did not station a lookout on the car floats until she had got opposite Fulton Ferry on the Brooklyn side. A ferryboat bound for Brooklyn had just left what is now the slip between Piers 16 and 17, 1,000 feet further up the river, passing under the stern of the Corning and her tow.

Positive testimony from the Isabela establishes that she did blow the usual long slip whistle, and continued to blow it until she was halfway out of the slip, and that her whistle was a very loud one, quite outweighing the testimony of witnesses on the Corning that they did not hear it. But I find that, contrary to the allegations in the libel and in the answer to the cross-libel, the Isabela did not blow fog signals after she got into the river. Her whole maneuver occupied but six minutes, and I think that at least for three or four minutes she was in the river clear of her slip before the collision. A very slight increase of time or space would have prevented the collision, and no one can say whether it might not have been avoided if the Isabela had blown her fog signal once or twice, or three times, as required by article 15 of the Inland Regulations of June 7, 1897 (Comp. St. § 7888). I come to this conclusion, not merely from the fact that witnesses on the Corning said that they heard no signal but from the testimony of the Isabela's master and second officer, as follows:

"Q. When was it that you stopped blowing the slip whistle? A. We never stopped; we kept it blowing all the time we were going out of this slip.

"Q. Were you blowing a slip whistle at the time of the collision? A. No; we had been blowing danger signals before that, one definite signal in reply to the danger signal from the Rawson; she gave me a danger signal.

"Q. That being so, you must have stopped blowing the slip whistle before the collision? A. Yes, sir.

"Q. When was it you stopped blowing the slip whistle with reference to any other event? A. When the ship was half way out of the slip.  *  *  *

"Q. How long after you gave the signal for full speed astern was it before you blew your slip whistle? A. Right away; instantly; as soon as my ship began to back out of the slip, I began to blow my slip whistle.

"Q. Did you blow it continuously? A. No; we kept it blowing and stop, and blowing and stop; that is what I call continuously.

"Q. Didn't you testify that you blew it continuously? A. That is meant in the law; that means continuously.

"Q. You say you gave a prolonged— A. Prolonged whistle.

"Q. What does a 'prolonged' mean? A. In the law it says—

"Q. I am not asking what the law— A. A prolonged whistle is six seconds.

"Q. You said, did you not, on direct examination, that you blew the usual slip whistle? A. Yes.

"Q. Do you mean that you blew a whistle simply six seconds long? A. Oh, no; I blew the whistle until the ship's stern was well out clear of the piers, so other ships would know what I am doing.

"Q. Did you blow one long slip whistle continuously from the time you started until your ship's stern was clear of the pier? A. Yes.  *  *  *

"Q. Going back to backing up, can you tell me how far the stern of your boat was beyond the outshore end of Pier 13 when you stopped blowing your slip whistle? A. About, I would say, well over halfway out of the slip before I stopped blowing the slip whistle.

"Q. You don't claim that you blew any other but one slip whistle? A. Just one slip whistle. I didn't give a statement; I was going port or starboard or astern; I was giving a slip whistle.

"Q. And you gave just one slip whistle? A. Just one.

"Q. And the only other signal I understand you blew was the alarm whistle, in answer to the signal given by the Rawson? A. Yes.

"Q. Those were the only whistles blown by the Isabela? A. Yes.

"Q. You are positive about that? A. Pretty sure about it.

. "Strumm, Master.

"Q. As the Isabela backed out of the slip, did you hear any signals of any kind? A. Just a long blast of the whistle, regulation slip leaving whistle.

"Q. That was the Isabela's whistle, was it? A. Yes.

"Q. When did that whistle commence blowing with reference to the time that the Isabela commenced coming astern? A. I presume—I am almost sure that it started before she started to go astern; as soon as I cast my lines off, started to blow the whistle. * * *

"Q. Had the slip whistle stopped blowing at the time you saw the car float? A. Oh, yes.

"Q. How long before, do you think? A. Maybe a minute or so. * * *

"Q. Did you hear any whistles just prior to the collision? A. Not any distinct whistles, no, sir, outside of one going out of the slip.

"Q. Do you know whether your vessel blew alarms or not? A. Only the regulation alarm signal, coming around the bend, or coming out of a slip, one long whistle.

"Q. That was the only whistle your heard your whistle blow? A. Absolutely.

"Wilson, Chief Mate."

In respect to not going ahead at once for the purpose of overcoming her sternway, the master testified that he first looked to see whether it was safe to do so with reference to two barges lying at the end of Pier 12, and that then he did go full speed ahead. It was his duty to exercise his judgment with reference to these two dangers, and that, even if he committed an error in not going ahead on his engines at once, it was in extremis, when the collision was inevitable, and for which no liability would attach.

When the Isabela's stern was out of the slip, the tug Rawson made fast with a line from her bow to the steamer's starboard quarter, and backed inshore and upstream, which caused the steamer's bow to move out toward the north side of Pier 12. This is the account given in the Isabela's pleading, and by her master, first officer, and third officer, and I believe it. The tide being nearly at high-water slack, its effect was negligible, and there was no reason for the tug Rawson to push the Isabela's stern out into the stream. To go ahead and push the stern in this way would have defeated the very purpose of the maneuver. The Corning blew an alarm, went full speed astern, with her helm hard astarboard, which carried the tow some 50 feet further out into the river. The tug Rawson, fearing to be crushed, let go her line to the steamer, blew an alarm, and the Isabela went full speed ahead, with her helm hard astarboard, notwithstanding which her stern came into collision with a car on car float No. 58. The vessels, after they discovered each other, were drawing together slowly, one or both having respectively still some motion ahead or astern. The contact was so gentle that none of the car float's lines parted, and the car itself was not derailed. Not more than a minute elapsed between the alarm signal of the Corning and the collision, and I think that then each was going at a moderate speed, and collision was inevitable.

I find that the Corning was at fault in two respects: First, for sheering over from the middle of the river to within 300 feet of the pier line at a point where the river is a little over 1,600 feet wide; and, second, for not hearing the Isabela's slip whistle. She should have navigated near the center of the river, especially in view of the dense fog, as the East River statute provides. Section 757, c. 410, Laws 1882. Its purpose was to protect vessels going into or coming out of slips. If she had kept near the middle of the river, the collision would not have happened. The City of Lowell, 152 Fed. 593, 81 C. C. A. 583. The master of the Corning offers as an excuse that he was looking for a place to tie up lower down, but this was not stated in his report to the steamboat inspectors, nor in the pleadings of the Corning, and there is no evidence that he did subsequently tie up, or try to tie up, and I do not believe that he intended to do so.

Counsel for the Corning has submitted a diagram to show the distance of the Isabela's stern from the pier ends, according to the estimate of various witnesses. I think that

the witnesses who estimated the angle of the Isabela with the pier line at less than 45 degrees was speaking of the angle in the direction that the tug Rawson was pulling the stern towards the pier ends, and not in the direction moving away from the pier ends, as the diagram assumes. The usual decree for half damages and half costs may be entered.