NEW YORK, O. & W. RY. CO. et al. v. CORNELL STEAMBOAT CO. et al.

(Circuit Court of Appeals, Second Circuit. December 11, 1911.)

No. 30.

COLLISION (§ 100*)—TUG AND TOW LAID UP IN FOG—FAILURE TO GIVE SIGNALS.

A tug with 8 boats in tow in two tiers of 4 boats each, the whole extending from 250 to 300 feet from her stern, passing down North River in the evening, on account of the dense fog, tied up with her starboard side along the end of Pier 1, North River, the tow trailing downstream or perhaps swung somewhat toward the shore by the tide. A helper tug tied up outside her where they lay through the night without sounding any signals. In the morning, the fog still continuing, a large fire boat lying at a wharf some 600 feet below received an alarm, and starting up the river near the pier ends came into collision with and sunk the outer boat in the rear tier of the tow, which, although she had a good lookout, she could not see until only a few feet away. Held, that the tug was in fault for lying with her tow where she did, without giving warning of her presence to other vessels by signals, and that the fire boat, considering the nature of her business, was not in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 213–215; Dec. Dig. § 100.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

---

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the New York, Ontario & Western Railway Company against the Cornell Steamboat Company and the City of New York. Decree for libelant against the Cornell Steamboat Company alone, and such respondent appeals. Affirmed.

The following is the diagram referred to in the opinion:

The following is the opinion of the District Court by Hough, District Judge:

On the evening of March 2, 1910, the Cornell Steamboat Company's tug Terry started from Forty-Eighth street, North River, with a tow of eight boats made up in two tiers of four each, intending to go into the East River, and there distribute the boats at their various destinations.

It is asserted that at the time of leaving Forty-Eighth street the weather was so foggy as to render it unsafe, and therefore negligent, to go out at all. I do not think the evidence sustains this allegation.

By the time tug and tow had gotten to Cortlandt street or below, the fog had become very dense, and the master of the Terry determined to tie up for the night. This he did by laying the starboard side of his tug against the outer end of Pier 1, North River, and running one line from his forward bitts to a pile or cleat on the northerly end of the pier.

The river face of this pier is 80 feet wide. The Terry is 90 feet long. Her master says that he had out two hawsers of between nine and ten fathoms from his towing bitts to the starboard and port boats, respectively, in the head tier (other witnesses estimate the length of this hawser at as much as a hundred feet). It is said by the only witness who testifies definitely on the subject that the distance between the stern of (at least one of) the forward boats and the bow of the after vessel was 7 feet. This seems an excessive estimate. But it is fully established that the average distance from the bow of the head boats to the stern of the after boats was rather over than under 200 feet.

The approximate method in which a tow thus arranged and fastened would lie at the end of Pier 1 if the tide had run truly at right angles to Pier 1 is shown by a diagram annexed to this memorandum.

It is, however, asserted on behalf of the Terry that the ebb tide or current does not run true at this point in the river, but sets in toward the New York shore, as I think would be natural, owing to the configuration of the land, Pier 1 being just above the turn out of the North River into the East.

It is therefore further asserted by the Terry that her tow tailed in toward the New York shore, and so far that the starboard boat in the after tier lay through the night some 45 or 50 feet from the end of Pier A.

It seems to me that the diagram annexed hereto shows that this was an impossibility, and indeed there could not have been any very great swing of this tow if the Terry's headline was kept taut and her starboard side against the end of the pier; further, any great pressure of the tide or current tending to set the boats in toward the New York shore would produce a dangerous strain upon the port towing hawser and a corresponding slacking on the starboard. In my judgment this tow lay during this foggy night not much out of the position indicated by the diagram aforesaid. Some time after the Terry had made fast to Pier 1 her helper tug, the Hedges, arrived and made fast alongside of her. Although the fog continued so dense that it was not only impossible to navigate, but men on the barges could not see the tugs, no effort was made by the Terry to give any sound signals indicating the presence of this tow. It is in evidence and found that Pier 1 is an unusual place to tie up tows in any such manner as this one was tied up. None of the tugmasters called herein ever tied up there before; and that the region between Pier 1 and Pier A is one of the most frequented and dangerous portions of the North River is matter of common knowledge.

At 9:04 a. m. of the following morning, the fog still continuing as dense as ever, the fire boat New Yorker lying at the city's wharf near the Aquarium, and distant from Pier A between 500 and 600 feet (in a straight line), received an alarm of fire from the corner of Barclay and Greenwich streets. The New Yorker is a very heavy boat, capable of making between 9 and 10 miles an hour, with 130 revolutions of her engine. She started out with her engines working at 35 revolutions, and 4 firemen and an officer on her forward deck acting as lookouts. Maintaining whatever speed 35 revolutions per minute would give her, she came in collision with the port boat of the after tier of the Terry's tow, inflicting such damage that the boat sunk in

a very short time. At this time the fog was so dense that the five lookouts on the New Yorker did not see the boat they sank until within 10 or 12 feet of it. The pilot of the New Yorker was steering by compass. He has undertaken to give his compass courses and the times he ran upon them up to the moment of collision. The times he gives are matters of estimate only. His course exactly as testified to cannot be plotted so as to bring him in collision. I am convinced he is in error as to the length of time he ran on each course. In that he has greatly overestimated the time. If, however, the tow was even approximately in the position indicated by the diagram attached hereto, it was a perfectly possible thing for him to get in collision as he did, on the course north magnetic to which he has testified. In order to do this, he would have been going up the North River very close to the pierhead line. That he was a little out of his course I have no doubt, and I am equally clear that when he so came into collision the boat which he struck was far outside the pierhead line and in waters ordinarily frequented by those having occasion to visit Pier 1 and Pier A.

The questions raised by these facts are whether it was negligent on the part of the Terry to fasten her tow when and where she did, and, if such position was permissible, to let it stay there without giving any sound signals throughout the extraordinary fog unanimously testified to, and also whether it was negligent on the part of the fire boat to be where she was, going at such a rate of speed (however slow) that she confessedly could not stop within the distance objects ahead could be seen.

In my judgment it is now firmly established in this circuit at all events that it is the duty of a tug obliged by dense fog to stop and tie up her tow and not able to get within the protection of a slip or basin to give some kind of sound signal to warn other vessels (even those who are also seeking a port of refuge) of the existence of such an unusual and dangerous obstruction as a raft tow of low lying craft.

Brown, District Judge, laid a somewhat similar duty upon a moving tow in The City of New York (D. C.) 44 Fed. 693, but such duty was held to be in contravention of the then existing statutory rule in 49 Fed. 956, 1 C. C. A. 483. Characteristically he returned to the matter in Hughes v. Pennsylvania Railroad Co. (D. C.) 93 Fed. 510, and suggested that, if signals from the tow were required as a matter of prudence, the duty should be laid upon the tug, and this judgment was affirmed in 113 Fed. 925, 51 C. C. A. 555; the Court of Appeals saying that under such circumstances a tug should have "stood by (her tow) and sounded signals which would have secured their safety." In The McCaldin Bros. (D. C.) 117 Fed. 779, the same doctrine was advanced. In The Raleigh (C. C.) 44 Fed. 781, Wallace, J., suggested that the helper tug might have been required "to station herself where the fog signals from that vessel would be serviceable." The matter was also considered in The Kennebec, 108 Fed. 300, 47 C. C. A. 339, in the Circuit Court of Appeals. In that case, however, the tug which had left a tow in an extremely exposed position in a fog was not a party to the cause.

While, therefore, there is ample authority for requiring notification of the dangerous presence of her tow from a tug, it is not so easy to deduce from the cases exactly what should be done. In my judgment what ought to be done will vary with almost every case, but in this instance I am of opinion that the means were at hand for a most effectual and lawful method of warning approaching vessels. The Hedges lay alongside the Terry all night, with nothing to do. If she had made fast to the end of the tow and sounded her bell, she would in my judgment have been practically at an anchor, and therefore entitled to sound a bell, and such sound if given would certainly have been heard by the watchmen on the New Yorker, which throughout the night lay not more than 600 feet away. For these reasons, I consider the Terry at fault.

So far as the fire boat is concerned, if to her is to be applied the strict rule regarding navigation in a fog (above noted), she too is at fault. Yet she was going as slowly as she could go and get anywhere, and her duty to go out even in such a fog as this is far more pressing and important than that lying upon a ferryboat and so often expounded in the cases.

In my opinion, if the New Yorker had been a commercial boat, she ought not to have gone out at all, but, being what she is, she was justified in going out. She was navigated with as great caution as the circumstances of her occupation permitted, and she was entitled to shave closely along the piers. It is quite clear that there would have been no collision had any kind of signal been given from, or on behalf of this tow, and under such circumstances I entirely agree with Coxe, J., in his concurring opinion in City of New York v. Steam Dredge No. 1, 180 Fed. 969, 104 C. C. A. 125, and hold the fire boat blameless.

The libelant will take a decree with costs against the Cornell Steamboat Company, and the libel as against the city will be dismissed, also with costs.

Amos Van Etten, for appellant.

Archibald R. Watson, Corp. Counsel (G. P. Nicholson, of counsel), for City of New York.

Peter Alexander, for libelant.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. We agree with Judge Hough for the reasons given by him that the respondent was solely at fault, and this whether the tow was hanging from Pier 1 straight down the river, as he found, or was swung in by the freshet current toward Pier A, as the respondent contended. It was not in a slip in either case but in waters which the fire boat had a right to use.

Decree affirmed, with interest and costs.