## THE PORT JOHNSON TOWING CO. NO. 7.

### (District Court, E. D. New York. June 29, 1915.)

COLLISION ☞95—TUG AND TOW—FOG.

A tug passing around the Battery and across the East River to Brooklyn after dark in a fog, which was dense in places and lighter in others, *held* in fault for a collision with a tow of 12 barges on hawsers passing up from Staten Island, upon evidence showing that she heard the fog whistles of the towing tug, indicating that she had a tow, and later alarm whistles, in time to have avoided the collision, but assumed that the tow was alongside. The towing tug *held* not in fault for proceeding under the weather conditions, as there was little or no fog when she started.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ☞95.]

In Admiralty. Suits for collision by A. J. & J. J. McCullom, Incorporated, and by Edward J. Phalen against the steam tug Port Johnson Towing Co. No. 7. Decrees for libelants.

Foley & Martin, of New York City, for libelants.
Carpenter & Park, of New York City, for claimant.

CHATFIELD, District Judge. On December 2, 1914, the records show the day to have been cloudy and without much wind, with more or less fog until 4:15 p. m. Rain began about 6:10 p. m., while the fog and light rain lasted until 10 o'clock in the evening. From 4:15 to 6:10 a condition of dense fog, in spots or localities, was reported all over the city. The towboat Nellie Tracy left Staten Island about 2 p. m. with a fleet of 12 loaded coal boats upon two hawsers 25 fathoms in length. The first two tiers consisted of 4 boats each. Another tug, the Walter Tracy, whose captain was generally in charge of the work, brought the tow part way across the harbor, when the Nellie Tracy, which in the meantime had procured coal, took up the towing, and the Walter Tracy took one of the barges from the third tier and ran ahead, so as to land it at Pier 5 in the East River. The Walter Tracy arrived at Pier 5 a little after 5 p. m., when another tugboat, the Reichert, was off Pier 6. Both boats heard alarm whistles from the Nellie Tracy, then somewhere off the upper end of Governor's Island in the Buttermilk Channel.

The witnesses upon the Walter Tracy and the Reichert testify that at this distance, some 2,500 feet, they could see the lights of the tow, and that it was misty and hazy, but that the fog was not dense. The captain of the Nellie Tracy testified that he could see some lights upon the New York shore and the lights upon both Governor's Island and the Brooklyn shore, and that he saw a boat, later proving to be the Port Johnson Towing Co. No. 7, about 700 feet away, nearly midway between Governor's Island and the ferry slips on the Manhattan shore, and headed upon a course a little east of south, which would take it astern of the Nellie Tracy, but not so as to clear the tow. The captain of the Tracy minimizes the fog conditions which were present, and also states that the No. 7 was abaft his port beam; but upon locating the positions upon the chart and upon giving further explanation, he has shown that the No. 7 was in fact some distance ahead of the Tracy, but several hundred feet to port at the time.

The captain of the Tracy had been blowing fog whistles at intervals, as was necessary, but at the time says he gave no fog whistles, as he could see the lights and the No. 7. Instead of fog whistles, he shortly after blew an alarm whistle and slowed down his tow. These are the alarm whistles which evidently were heard by the boats up around Pier 5. At about the same time a city ferryboat, headed for the Hamilton avenue slip in Brooklyn, had run across the East River close to the Atlantic avenue ferry slips, and in thick fog was starting to work down the Brooklyn shore. This ferryboat was on a trip which was scheduled to leave New York at 5:15 p. m. Just off the Atlantic Ferry slip it nearly came into collision with a tugboat, the Catherine Moran, which had left the Erie Depot in Jersey City at 5:10 p. m. and had thus proceeded a little over two miles when, without seeing the Hamilton avenue ferryboat and intending to make the south side of the Atlantic avenue ferry, the captain of the Moran found himself almost in collision with the ferryboat and at a point where he subsequently ran in upon the north side of the Atlantic ferry. The captains of the ferryboat and of the Moran fix this occurrence at between 5:25 and 5:30 p. m., and the captain of the Moran saw nothing of the Tracy or her tow. The captain of the ferryboat, however, proceeding immediately thereafter, passed a boat which was proceeding up the Buttermilk Channel with a tow, which he recognized as the Nellie Tracy from her peculiar whistle, just as the ferryboat was off Baltic street. This would be substantially the place fixed as that of the collision, and as the Nellie Tracy, after the collision, proceeded on up the river, it would appear that the ferryboat went by the Tracy and her tow, either just before or just after the collision itself, and at a time when the Tracy was blowing signals.

It may be assumed that on a December evening, between 5 and 6 o'clock, with such conditions of rain and fog, darkness would increase rapidly, and that dense fog might affect the ferryboat close in by the Brooklyn shore, more than the boats which were a little further out in the stream. But there can be no question that the conditions were such that care in navigation was necessary, and that fog signals were required wherever the thick dense fog settled over a limited area

or enveloped a moving boat. All of the captains testify that in the Hudson river lights could be seen a considerable distance, and it was not until they approached or rounded the Battery that difficulty was experienced.

The No. 7 left Gansevoort street, New York, according to her captain, at 5:10 p. m. At that time the fog was light, so that he could see across the Hudson River. He therefore left the captain of the other watch in charge of the boat and went to supper, coming out from the supper room just as the No. 7 came in collision with the Tracy's tow. He testifies that the boat reached the Battery at 5:25 p. m.; his engineer fixes the time of starting at least 10 minutes earlier, and there may have been a difference in clocks upon the boat. But the captain, as they rounded the Battery, realized that the No. 7 was blowing fog whistles every minute, and he also heard the Tracy's fog whistles sounded, one long and two short, for two or three times, and apparently then went on deck. The collision occurred, and he then heard the Tracy blowing what he assumed were whistles to attract the attention of the men upon the barges. He had the searchlight of the No. 7 then turned upon the barges, but the fog was at that point so dense that the searchlight did not scatter it so as to give clear vision. Upon the arrival of the Walter Tracy, the No. 7 proceeded to a point just below the Hamilton ferry slip in Brooklyn, where it had been headed for the purpose of getting water.

The pilot of the No. 7 and also the deckhand, who had been called into the pilothouse and was actually handling the wheel at the time, testified that as they came around the Battery the fog was very dense, that they saw nothing of the Tracy and her tow, and that no lights could be seen in the fog at any substantial distance from the boat. In some way they appreciated the whereabouts of a Staten Island ferryboat, which was starting out and for which they waited, passing under her stern. Both of these witnesses, and also the deckhand who was on watch upon the No. 7, testify that they heard the whistles from the Tracy with a tow, but saw no lights until the alarm whistles, which were just at the time of collision, and after the No. 7 had given a signal to reverse, or had actually reversed, her engines. It appears that the No. 7 can be reversed very quickly, and has a steam steering gear, so that she can be turned quickly. She is a very large and powerful tug of but moderate speed, and when light is capable of making about 10 knots an hour. According to the testimony of her witnesses, she had been making good speed down the Hudson, but upon coming around the Battery she had been reduced, when running into the fog, to about 25 or 30 revolutions a minute, so that she was not going more than 3 miles an hour just before the collision. The blow was a severe one, as the No. 7 struck and severed the hawser leading from the port barge in the first tier of her tow, then struck that barge, and, continuing across the bow, ploughed into the second barge of the tier. The forward motion of the tow and the weight of the No. 7, combined with her headway, explains the force of the collision, and makes it unnecessary to suppose that her speed was greater than that which is testified to.

The No. 7 charges fault on the part of the Tracy in navigating in the fog with a large tow upon hawsers. The pilot and deckhand at the wheel of the No. 7 both testify that they heard the whistles of the Tracy. The captain of the No. 7 heard these whistles even when he was at supper, and thus absolves the Tracy from responsibility for failure to give whistle signals, but contradicts the captain of the Tracy, who, according to his recollection, had not found it necessary to give whistles because of the fog for some distance preceding his arrival at the point of collision. Both the captain and the helmsman upon the No. 7 testify that they heard the whistles of the Tracy broaden off upon their port side and away from their port bow, and that they assumed, for some reason or other, that the Tracy had a boat alongside, instead of upon a hawser, as they understood and appreciated the signals to mean that the Tracy was in charge of a tow. The man at the wheel testifies that just before the collision he put his helm to starboard to avoid a ferryboat coming from Brooklyn, and his testimony would indicate that this maneuver carried the No. 7 further up the river and across the course of the Tracy, when otherwise the No. 7 might have proceeded under a port helm on such a course as to pass the Tracy's tow port to port. The positions of the boats upon the chart would indicate that any appreciation on the part of the No. 7 as to the position of the Tracy and her tow would have caused the No. 7 to pass down closer to Governor's Island and astern of the tow before crossing to Brooklyn.

The Tracy charges fault on the part of the No. 7 in so navigating as to strike the tow after hearing the signals indicating the presence of the tow, when without stopping and in the fog the No. 7 kept on her course until the time of collision. If the witnesses upon the No. 7 had not heard the Tracy's signals, and if it appeared from the evidence that the Tracy had been running in the fog without giving signals, under such conditions that her lights could not be observed, then negligence on the part of the No. 7, even though she were compelled to swing to port, so as to avoid the Brooklyn ferryboat, would not be so evident. If the Tracy had not seen the No. 7, and had depended upon whistle signals in a fog, then her blowing of alarm signals and stopping would have been entirely consistent. But her witnesses testify that, having *seen* the No. 7, apparently in a position where navigation signals might have been given, the Tracy blew an alarm signal, and acted as if she were proceeding in a fog.

It seems to be necessary to hold from these conflicting statements that the Tracy was not negligent generally in proceeding with a tow of this sort under the conditions which prevailed up to the time of reaching the Buttermilk Channel, and that the conditions generally upon the river were not such as to justify an assumption that every tow would be alongside and not on hawser. At the point in question the Tracy seems to have actually run into the dense fog which was prevailing along the Brooklyn shore, and even though toward New York lights could be seen, and though the Tracy could see the No. 7, it is possible and probable that the Tracy and her tow were in more dense fog than was the No. 7.

Under these circumstances there would seem to be no negligence at all on the part of the Tracy, and if the conditions were such that navigation signals were possible, or that navigation by courses should control the boats, the No. 7 was bound to keep out of the way. If the Tracy was in a fog, then her blowing of an alarm whistle or sounding of fog whistles, which were heard by the No. 7, and which were heard even at a point where the Tracy was broadening out upon the No. 7's port side, put upon the No. 7 the obligation of stopping or at least ascertaining the position of the Tracy's tow before attempting to cross to Brooklyn. If the presence of the Brooklyn ferryboat and the density of the fog prevented the No. 7 from appreciating the nearness of the Tracy and her tow, then the fault would be that of the No. 7. Upon the entire case the fault must be held to lie with the No. 7 and not with the Tracy.

Counsel for the No. 7 have cited such cases as The Chicago, 146 Fed. 979, 77 C. C. A. 225, and The Express, 212 Fed. 673, 129 C. C. A. 208, as authority for its proposition that the Tracy and her tow should not have proceeded under such weather conditions. But the voyage in question was not undertaken when danger from the fog was evident, as was disapproved in the cases cited. Nor did a situation develop requiring the tow to stop and tie up before the No. 7 appeared. The rule established in the City of Lowell, 152 Fed. 593, 81 C. C. A. 583, would not have prevented the present accident, for this was not caused by the movement of the Tracy, although if the Tracy had stopped, the blow might have been less harmful. The No. 4, 161 Fed. 847, 88 C. C. A. 665; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053. So, also, the rule stated in The Bayonne, 213 Fed. 217, 129 C. C. A. 560, requiring navigation with caution, under article 16 of the Inland Rules (Comp. St. 1913, § 7889), did not require the Tracy to do anything other than as she did do, and whether the ordinary rules of navigation, or article 16, applied, it was the No. 7 which should have used caution. The City of New York, 49 Fed. 956, 1 C. C. A. 483; New York, Ontario & Western Ry. Co. v. Cornell Steamboat Co., 193 Fed. 380, 113 C. C. A. 306, as well as The Express (supra), and the case of Howard v. Jersey Central Railroad Co., 221 Fed. 625, 137 C. C. A. 349, establish the rule that a boat in a tow is not bound to blow fog signals or navigation signals unless it is evident that some imminent danger is unwittingly approaching.

Upon the whole case it must be held that the fault was with the No. 7, and that no fault existed on the part of the Tracy.